

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-6-2004

# Stratton v. EI DuPont de Nemours

Precedential or Non-Precedential: Precedential

Docket No. 03-2609

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Stratton v. EI DuPont de Nemours" (2004). *2004 Decisions.* Paper 754.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/754

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

No. 03-2609

MELANIE STRATTON;
JEFFREY STRATTON, her husband

Appellants

v.

E. I. DUPONT DE NEMOURS & CO.

On Appeal from the United States
District Court for the Western District of
Pennsylvania
(D.C. No. 02-cv-02131)
District Judge: Hon. Arthur J. Schwab

Argued March 8, 2004

Before: SLOVITER, NYGAARD,
Circuit Judges and OBERDORFER,
District Judge[*]

(Filed April 6, 2004 )

---

[*]    Hon. Louis F. Oberdorfer, Senior
District Judge, United States District
Court for the District of Columbia,
sitting by designation.

Stella L. Smetanka
Jonathan Will   (Argued)
       Law Student Specially Admitted
       Pursuant to Third Cir. LAR 46.3
University of Pittsburgh School of Law
210 South Bouquet Street
Sennott Square - Room 5220
Pittsburgh, PA 15260

       Attorneys for Appellants

Raymond M. Ripple   (Argued)
Donna L. Goodman
E.I. DuPont de Nemours & Company
Legal Department
Wilmington, DE 19898

       Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Melanie Stratton appeals
from the order of summary judgment
entered on behalf of defendant E.I. DuPont
de Nemours & Co. ("DuPont").  Stratton
filed this suit pursuant to the Employee
Retirement Income Security Act
("ERISA"), 29 U.S.C. § 1132(a)(1)(B),
seeking repayment of medical benefits she
incurred for a surgical procedure to treat
her temporomandibular joint dysfunction
("TMJ").[1]  We have jurisdiction to hear
this appeal under 28 U.S.C. § 1291.

---

[1]    Stratton also included a bad faith
claim under Pennsylvania law that is not
at issue in this appeal.

## I.

Stratton had health insurance through an employer-sponsored health plan of DuPont, her husband's employer. The plan covering Stratton excludes "[c]harges for services or supplies not medically necessary for the diagnosis and treatment of the illness or injury." J. App. at 26.[2] It defines the term "medically necessary" as a "service or supply which is reasonable and necessary for the diagnosis or treatment of an illness or injury, in view of the customary practice in the geographical area, and is given at the appropriate level of care." J. App. at 15. It is undisputed that first Aetna U.S. Healthcare ("Aetna"), the insurance carrier for DuPont, and ultimately DuPont had discretion to administer the plan with regard to medically necessary services and supplies.

The facts set forth hereafter are taken from the record on the summary judgment motion and are not in dispute.

In 1990, Stratton's doctors diagnosed her with TMJ, and for the next ten years she suffered from headaches and the inability to open and close her mouth, chew, yawn, and laugh without pain. She underwent many forms of conservative treatment, including splint therapy, orthodontia, dental work, analgesics and muscle relaxants. After

these treatments met with only temporary relief, Dr. Donald J. Macher, an oral surgeon, suggested that Stratton undergo arthroplasty surgery for her TMJ. The full medical term for this surgery is "Right and Left Temporomandibular Joint Reconstructive Arthroplasty," J. App. at 156, and it is an invasive procedure that involves repositioning discs, lysis of adhesions, and the insertion of a previously constructed splint into the mouth.

On or about November 13, 1999, Aetna initially denied coverage for the surgery but in late December requested that Stratton submit an updated magnetic resonance image ("MRI") so that her request could be further considered. The most recent MRI in Stratton's record until that date was taken February 8, 1990; at Aetna's request, Stratton obtained an updated MRI on January 3, 2000. Stratton submitted the updated MRI, which a specialist at Aetna, Dr. George Koumaras, reviewed. On January 6, 2000, Aetna denied coverage for the requested surgery on the ground that there were more conservative and medically appropriate treatments available, such as arthrocentesis or arthroscopic surgery. Arthrocentesis involves anesthetizing the affected TMJ and then flushing the joint with a sterile solution to lubricate the joint surfaces and reduce inflammation, see American Academy of Orofacial Pain, at http://www.aaop.org/info_arthro.htm; arthroscopy involves inserting an imaging and therapy device into the

_____

[2] We use "J. App." to cite to the Joint Appendix, and "App." to cite to Appellants' Appendix.

affected TMJ.  See id. at http://www.aaop.org/info_surgery.htm. Stratton nevertheless went ahead with the arthroplasty surgery on January 13, 2000 and covered the cost of $9,829.05 herself.

Following her surgery, Stratton continued to appeal the denial of benefits within Aetna, which waited to review the post-operative report and any other information pertinent to the surgery before making a final decision on her appeal.  Aetna had three physicians review her claim, including Dr. Hendler – an independent physician from the University of Pennsylvania who is Board Certified in Oral and Maxillofacial Surgery, specializes in TMJ, and was not involved in the original decision.  Dr. Hendler also decided that less invasive surgeries would have been more appropriate.  Aetna denied Stratton's claim on February 10, 2000.

Stratton appealed to DuPont. DuPont reviewed the documents on which Aetna had based its denial and its own files to see how similar cases had been handled in the past to ensure that its plan was being administered consistently. On the basis of the record before it, DuPont upheld Aetna's denial of coverage and informed Stratton of this decision on April 18, 2000.  The District Court held that the plan grants discretion to determine eligibility for benefits,

> which triggers the arbitrary
> and capricious standard of
> review, diminished perhaps

to a slightly less deferential standard because of the slight conflict of interest. But even under a heightened standard of review, the record before the administrator (Aetna) and, on appeal to the DuPont Medical Care Plan, supports the denial of coverage for plaintiff's TMJ surgery.

App. A at 6 (District Court Opinion).

On appeal, we must consider whether the District Court properly reviewed the denial of coverage under a "slightly less deferential" arbitrary and capricious standard, App. A at 6, and whether it properly granted the summary judgment motion.  We exercise plenary review over a district court's grant of summary judgment.  Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 173-74 (3d Cir. 2001).  Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law when viewing the facts in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  We apply the same standard that the District Court should have applied.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000).

Because the District Court reviewed the claim under the appropriate standard and did not err as a matter of

3

law, we will affirm its decision.

## II.

*A. Standard of Review*

Stratton's first argument on appeal is that the District Court should have used a heightened arbitrary and capricious standard, but it is unclear that this would entail closer scrutiny of the decision of the employer than the "slightly less deferential" arbitrary and capricious standard of review employed by the District Court in the instant case. App. A at 6. The standard of review in cases brought under ERISA for benefits denied is not always easy to apply. In the seminal case on this issue, the Supreme Court stated that "a denial of benefits challenged under [ERISA, 29 U.S.C.] § 1132(a)(1)(B) must be reviewed under a de novo standard unless the benefit plan expressly gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 102 (1989). In cases where an administrator exercises discretion, "[t]rust principles make a deferential standard of review appropriate" and the Court suggested that we review such exercises of discretion under the arbitrary and capricious standard. Id. at 111-12. The Supreme Court continued, "[o]f course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Id. at 115 (internal quotation and citation omitted).

Attempting to distill this direction into a workable standard, we have held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 378 (3d Cir. 2000). This "heightened" form of review is to be formulated on a sliding scale basis, which enables us to "review[ ]the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of beneficiaries." Pinto, 214 F.3d at 391 (quoting Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993)). In employing the sliding scale approach, we take into account the following factors in deciding the severity of the conflict: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the "presumed desire to maintain employee satisfaction." Pinto, 214 F.3d at 392.

Our examination of the factors set forth in Pinto in light of the circumstances in this case leads us to conclude that the District Court did not err in holding that the instant case

4

"triggers the arbitrary and capricious standard of review, diminished perhaps to a slightly less deferential standard because of the slight conflict of interest." App. A at 6. We assume there was a sophistication imbalance between the parties. There is no reason why Stratton would have had ERISA or claims experience, whereas DuPont, a large, successful company with many employees, had numerous such claims. In fact, DuPont reviewed its record of claims before denying Stratton's claim. It follows that this factor weighs in favor of heightening the standard. Regarding information accessibility, Stratton has alleged no information imbalance, nor should one be inferred. A review of the record shows a conscientious effort on the part of Aetna to keep Stratton apprised of the information it had at its disposal and the reasons animating its decision to deny benefits. This second factor does not alter the arbitrary and capricious standard.

The third factor, the exact financial arrangement between the insurer and the company, requires more attention. The conflict alleged is that the plan is funded by the employer, DuPont, on a case-by-case basis instead of on a fixed price basis that has been actuarially determined. Theoretically, then, DuPont may have some incentive to deny coverage on individual requests, assuming that it has no interest in "avoid[ing] the loss of morale and higher wage demands that could result from denials of benefits." Nazay v. Miller,

949 F.2d 1323, 1335 (3d Cir. 1991). However we have noted that a situation in which the employer "establish[es] a plan, ensure[s] its liquidity, and create[s] an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits" does not typically constitute a conflict of interest. Pinto, 214 F.3d at 383. This describes in large part the mechanism DuPont chose to fund and administer its benefits plan. Although the case-by-case decisionmaking, which as Stratton points out means that each claim dollar avoided is a dollar that accrues to DuPont, may leave room for some bias, the fact that DuPont structured the program by using Aetna to hear the claim initially provides the safeguard of neutral evaluation. In fact, the physicians to whose opinions Stratton objects were affiliated with Aetna, not DuPont. This factor thus counsels for only a slightly heightened standard.

The final factor regarding the status of the fiduciary is not relevant. Stratton alleges no facts regarding the financial health or long term plans of the company that would undermine the "presumed desire to maintain employee satisfaction." Pinto, 214 F.3d at 392.[3]

---

[3] At oral argument DuPont argued, pursuant to Romero v. SmithKline Beecham, 309 F.3d 113, 118 (3d Cir. 2002), that the $9,829.05 claim is sufficiently de minimus compared to DuPont's profits to negate any inference of conflict. Because this was not

5

Stratton alleges no facts that would give rise to an inference of conflict other than the fact that DuPont both funds and ultimately administers its own plan after outsourcing the initial phases of administration. Given this, the District Court properly heightened the arbitrary and capricious standard slightly to accommodate what appears to be a potential, even if negligible, chance of conflict.

It is easier to decide which standard to use than to apply it because it is not clear how to employ a slightly heightened form of arbitrary and capricious review.

> We acknowledged that there is something intellectually unsatisfying, or at least discomforting, in describing our review as a heightened arbitrary and capricious standard. . . . The routine legal meaning of an arbitrary and capricious decision is . . . a decision without reason, unsupported by substantial evidence or erroneous as a matter of law. Once the conflict becomes a factor however, it is not clear how the process required by the typical arbitrary and capricious review changes. Does there simply need to be more evidence supporting a decision, regardless of whether that evidence was relied upon?

Pinto, 214 F.3d at 392 (internal quotations omitted).

Finding this wanting, we decided that "we can find no better method to reconcile Firestone's dual commands than to apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of our review to the intensity of the conflict." Id. at 393. We concluded that we "will expect district courts to consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." Id.

Taking our cue from the somewhat enigmatic Pinto language, we will scrutinize carefully any allegations that Aetna erred in the manner in which it reviewed Stratton's claim, as such errors might confirm Stratton's

---

discussed in the briefs, and because there is no evidence of record regarding DuPont's financial health, we decline to discuss the issue here. We noted in Pinto "that when more money was at stake–i.e., when a large class of beneficiaries requested and was denied benefits–the potential conflict might invite closer scrutiny." Pinto, 214 F.3d at 386. No such large sum of money is at stake in the instant case.

6

contention that there was a conflict of interest. This would comport with the sliding scale inquiry used in the Fourth Circuit, which gives the fiduciary decision "some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." Group Hospitalization & Medical Servs., 3 F.3d at 87.

*B. Summary Judgment*

Of particular significance is our precedent holding that a court may not substitute its own judgment for that of plan administrators under either the deferential or heightened arbitrary and capricious standard. Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc., 298 F.3d 191, 199 (3d Cir. 2002) (citation omitted). Even under the heightened standard, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Id. at 199 (quoting Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000)). Stratton does not argue that either Aetna or DuPont deviated from required procedures.

Stratton makes three principal arguments with regard to DuPont's denial of her claim: that Aetna's physicians did not give Stratton's claim individualized review, that these same physicians failed to consider that less

invasive treatments had not worked for Stratton in the past, and finally that they failed to accord sufficient deference to the opinion of her treating physician. These arguments are unpersuasive.

In her briefs and during oral argument, Stratton asserts that an e-mail submitted by Dr. Koumaras, which stated, "studies have shown that 85% of those cases operated on regarding respositioning of the disc do fail and the disc usually relocates itself to the dislocated position," J. App. at 200, demonstrates that Aetna made its determination of benefits based on a generalized review not focused on Stratton's individual experience. However, the statistical likelihood that the surgery will be successful is relevant to deciding whether it is "medically necessary." Also, Dr. Koumaras' medical opinion was based on his experience in and knowledge of the field, an important predicate for recommendation of individual treatment. Furthermore, there are documents of record that show that Stratton's claim did receive individualized attention. One such document, a letter in which Dr. Koumaras quotes the independent physician Dr. Hendler, indicates that the Aetna physicians scrutinized the medical evidence at least as closely, if not more, than did Dr. Macher. It noted,

> Plain films [of an MRI taken in 1990] did not indicate any evidence of degenerative joint disease . . . . A recent MRI was

obtained after recommendations by [Aetna] reviewers . . . . Performing surgery of this magnitude without a current MRI would, in fact, be a deviation of standard of care. On January 3, 2000, a MRI revealed minimal disc displacement.[4] In light of the patient's failure to respond to conservative (nonsurgical) therapy and based on the clinical findings offered in Dr. Macher's records, less invasive arthrocentesis and/or arthroscopic surgery would be considered the procedure of choice.

. . ."

J. App. at 100.

Careful scrutiny of the record reveals that the criticism that Aetna paid insufficient attention to Stratton's claim is unwarranted. The record here is detailed and comprehensive because DuPont and Aetna took many steps in considering Stratton's claim: Aetna invited additional information and medical history by Stratton, Dr. Macher, and her previous treating physician, Dr. R.H. Tallents, after first denying coverage, reviewed the TMJ post-operative report, and finally had three physicians, one of whom was not involved in the original decision, review the information submitted before finally denying Stratton's request. Aetna's request of an updated MRI which it then reviewed rebuts Stratton's contention that its consideration of her claim was general as opposed to individual.

It is undisputed that Stratton attempted neither arthrocentesis[5] nor

---

[4] At oral argument, Stratton's counsel argued that Koumaras incorrectly characterized the 2000 MRI as showing disc displacement only on the left side. However, the observation of the "normal temporomandibular joint disc-condyle relationship on the right" referred to the 1990 MRI, not the 2000 MRI. J. App. at 182.

---

[5] Appellants' counsel asserted during oral argument that because there is no medical finding of record that Stratton's joint contained excess fluid, a recommendation that she undergo arthrocentesis was medically inappropriate. But arthrocentesis is not a fluid-draining procedure; it is a procedure in which a sterile solution is inserted into the joint and then drained away. This discussion is of no moment, however, because this argument

arthroscopic surgery, both of which are less invasive treatments than the arthroplasty she chose to undergo and both of which Aetna physicians recommended in lieu of the arthroplasty. Stratton argues that "to say that [she] refused conservative treatment is a gross mischaracterization of her medical history," Appellant's Br. at 14, because over the years, she had undergone several conservative courses of treatment, including an occlusal splint, analgesics, and muscle relaxants. But this argument itself mischaracterizes the record. DuPont notes in an affidavit of Jean Opreska, a Health Care Benefits Consultant and Qualified Benefits Consultant for DuPont, that "Aetna still recommended denial of benefits because Ms. Stratton refused more conservative medical treatment." J. App. at 91. Because the only more conservative medical treatments recommended by Aetna were "less invasive arthrocentesis and/or arthroscopic surgery," J. App. at 100, we can assume that it was to these treatments that Opreska's affidavit referred–not to the treatments previously undertaken by Stratton.

Aetna specifically acknowledged Stratton's "failure to respond to conservative (non-surgical) therapy," J. App. at 122, which presumably meant that she continued to suffer from headaches and other pain whenever she

---

regarding the medical propriety of arthrocentesis was not mentioned in the Appellants' briefs.

opened or closed her mouth, chewed, yawned, or laughed. It was in light of this failure and "based on the clinical findings offered in Dr. Macher's records" that Aetna's physicians recommended these two less invasive surgical procedures. J. App. at 122. We are not in a position, nor are we permitted, to decide which of the three procedures was best tailored to Stratton's case. But a review of the record shows that DuPont acknowledged and considered that the more conservative treatments had not worked for Stratton in the past and that its suggestion that she undergo less invasive procedures was not based on oversight.

The final argument Stratton makes is that Aetna, DuPont, and the District Court failed to accord sufficient deference to the opinion of her treating physician, Dr. Macher, who recommended the arthroplasty. Just last Term, the Supreme Court in Black & Decker Disability Plan v. Nord, 123 S. Ct. 1965, 1967 (2003), held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." In so holding, the Court also stated,

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But we hold, courts have no warrant to require administrators automatically to accord

9

special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Id. at 1972.

As Stratton notes, Dr. Macher in his post-operative report stated that he "did not feel that arthroscopy or arthrocentesis would provide sufficient mechanical relief of the problems within the joint and thus [ ] discussed [with Stratton] the risks, benefits and alternatives of TMJ arthroplasties." J. App. at 115. Aetna's physicians did not arbitrarily refuse to credit this opinion; they simply disagreed with Dr. Macher's recommended treatment. It appears that they may have been wary of Dr. Macher's initial recommendation because he made that recommendation before he had an updated MRI. See J. App. at 122. Aetna acknowledged that Stratton had not responded to her previous course of treatment but concluded that less invasive forms of surgery would be more appropriate because repositioned discs usually migrate back to their original position. See J. App. at 200 (referring to studies that have shown that 85% of such cases revert to prior position). A professional disagreement does not amount to an arbitrary refusal to credit.

The Supreme Court in Black & Decker Disability Plan, in discussing the relative inclinations of consulting physicians engaged by a plan and treating physicians stated, of the latter, that "a treating physician, in a close case, may favor a finding" for the patient. 123 S. Ct. at 1971. The Court eschewed deciding whether "routine deference to the claimant's treating physician would yield more accurate [claim] determinations," because such a determination "might be aided by empirical investigation of the kind courts are ill equipped to conduct." Id. The professional disagreement between Aetna's consulting physicians and Stratton's physician seems grounded in differing conclusions based on the review of Stratton's MRI, past medical history, and the likelihood that the chosen course of action would be successful or not. Because Black & Decker Disability Plan holds that plan administrators are not obliged to defer to the treating physician's opinion, the District Court did not err in upholding the decision of the plan administrators.

Having carefully considered the arguments put forth by Stratton that Aetna and DuPont erred in denying her claim, as the intensified degree of scrutiny requires we do, we cannot hold that the denial of benefits in this case was "clearly not supported by the evidence in the record." Smathers, 298

10

F.3d at 199.

## CONCLUSION

For the reasons set forth, we will affirm the District Court's order granting summary judgment to DuPont.

---