

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-13-2006

# Havens v. Cont Cslty Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3075

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Havens v. Cont Cslty Co" (2006). *2006 Decisions.* Paper 911.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/911

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-3075

WILLIAM HAVENS,
                                    Appellant

v.

CONTINENTAL CASUALTY CO.,
(CNA)

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil 04-cv-03268
District Judge:  The Honorable Juan R. Sanchez

Argued:  May 11, 2006

Before: BARRY, SMITH and TASHIMA,[*] Circuit Judges

(Opinion Filed June 13, 2006)

Donald E. Havens, Esq. (Argued)
8246 West Chester Pike
Upper Darby, PA 19082

Counsel for Appellant

---

   [*] The Honorable A. Wallace Tashima, Senior Circuit Judge, United States Court of
Appeals for the Ninth Circuit, sitting by designation.

Michael J. Burns, Esq. (Argued)
Christie, Pabarue, Mortensen & Young
1880 John F. Kennedy Boulevard
10th Floor
Philadelphia, PA 19103

<u>Counsel for Appellee</u>

————

OPINION

————

BARRY, <u>Circuit Judge</u>

William Havens's insurer, the Continental Assurance Company ("Continental"),

denied him long-term disability based on a finding that he was not prevented from

engaging in "any occupation." Havens brought suit and the District Court found for

Continental. Because we conclude that that determination was incorrect, we will reverse

and remand with instructions to enter judgment for Havens.

**I.**

Havens worked as a regional property inspector for the Continental Financial

Corporation.[1] He suffers from diabetes and a host of related ailments, including problems

with his retinas and bladder. He had his gall bladder removed in 1998 and had surgery in

1987 to remove neurofibromas from his neck. On October 15, 1999, while on a business

—————————

[1] Continental Assurance Company (the defendant) and Continental Casualty (the name
on the caption of the case) are both members of the same corporate family as Havens's
employer.

trip, he suffered an injury to his back when a bed at a Ramada Inn collapsed beneath him. Since then, he has had serious pain in his lower back and right leg. He has damage to the nerve roots between the L4 and S1 vertebrae of his spine, a condition medically known as radiculopathy and often caused by a violent impact or the reduced blood flow associated with diabetes.

Havens consulted with numerous doctors, most extensively with Dr. Leon DeMasi at the Crozer Keystone Health System Centers For Occupational Health. Dr. DeMasi's diagnosis was "[d]egenerative joint disease and degenerative disc disease of the lumbosacral spine with radiculopathy." Dr. DeMasi indicated an increasingly stringent set of activity restrictions, ultimately settling on (handwritten portions in bolded italics):

> "No bending, squatting, crawling kneeling
> Change sitting standing position frequently *as needed*
> No lifting over *10* pounds
> Driving permitted *Limited      Frequent Rest Breaks*      for *4 hours*
> Pushing pulling up to *10* pounds
> Climbing/walking stairs permitted *N      Ladders/Roofs*
> Other *Driving - lumbar support*

Other doctors at Crozer Keystone who treated Havens included a neurologist, a rheumatologist, and an endocrinologist. Dr. Richard Dillon, the endocrinologist, did not believe that Havens's diabetes was significantly affecting his health, thought that neurofibroma might be a cause for his back pain, and doubted that the 1999 injury significantly exacerbated the back pain. He recommended back surgery, though he said that "most commonly patients with back disorders do well to ignore them and continue on with their job as best possible and that focusing on the problem may aggravate it."

3

Havens also saw Dr. Andrew Freese, a neurologist, who ordered and evaluated multiple MRIs of Havens's lumbar spine, noting injured spinal discs, impingement on nerve roots, and evident pain.

Dr. Marc Cohen conducted a Functional Capacity Evaluation ("FCE"), on which Havens scored no higher than "Light" on any of the lifting tasks, and "Medium" on the carrying task. Dr. Cohen's cover letter read:

> "RELIABILITY AND CONSISTENCY OF EFFORT
> . . . Mr. Havens gave a reliable effort . . .
> FUNCTIONAL ABILITIES
> Mr. Haven's demonstrated abilities meet specified job demands in the following categories: High Lift, Mid Lift, Walk, Carry - 10 Lb, Carry 20 -Lb, Carry - 50 Lb, Balance, Kneel, Reach to Front, Handling, Bi-Manual Handling, Bi-Manual Fingering.
> RESTRICTIONS AND MODIFICATIONS
> Mr. Havens is unable to meet job demands in the following categories: Low Lift, Stoop, Climb Stairs, prolong sitting and standing for longer than 30 minutes at a time.
> RECOMMENDATIONS
> The patient is restricted from sitting, driving, standing and ambulation for periods no longer than 30 minutes for each position. The patients work restriction is limited to a maximum of 4 hours per day. Testing has demonstrated the patient's ability to use short bursts of strength, but an inability to sustain longer periods of physical activity. I would recommend a reconditioning program to address the patient's cardiovascular insufficiency, proprioception and muscular endurance."

As part of related workers' compensation litigation, Havens saw Dr. Menachem Meller for two Independent Medical Evaluations. On the first, Dr. Meller concluded, "Although[] he does have severe significant disabling problems with regard to his back, his bladder, his leg, and his neck, none of these things are in any way related to his work injury." Dr. Meller signed an Affidavit of Recovery, stating that Havens had "fully

4

recovered" from "Lumbar spasm and strain / Right L5 Radiculopathy." On the second, Dr. Meller called the "work related injury . . . fully and completely resolved," and stated, "If not for his unrelated and pre-existing medical conditions, he would be able to [perform the tasks associated with his previous job]."

Havens's family physician, Dr. Brian Boucher, responded to a one-page, three-question form (a "Functional Assessment Tool") asking whether Havens was "currently capable of performing work at this time which is primarily seated in nature, however allows the flexibility to stand when needed and requires lifting less than 10#?" Dr. Boucher checked "no" and wrote, "minimal physical activity, no lifting / fully ambulatory."

## II.

At first, Havens attempted to keep working in his previous job with appropriate modifications, a solution that proved unsuccessful. The modified option was terminated on July 28, 2000. Since then, Havens has made multiple attempts to recover for his injuries and loss of income. His tort suit against Ramada settled. He applied for workers' compensation; it was granted on August 8, 2000, and the award was upheld on November 28, 2001. He applied for Social Security Disability benefits and was granted them as of February 2001. Most importantly for our purposes, he applied for disability benefits under his group disability coverage through Continental. He was approved for short-term disability benefits on November 1, 2000, based on a disability deemed to have begun on August 7, 2000. Continental began paying him long-term disability benefits as of August

5

7, 2001.

Under Havens's long-term disability policy, Continental agreed to pay benefits equal to two-thirds of a claimant's pre-disability income if the claimant was "disabled." "Disabled" was defined as follows:

> "[After the first year of benefits], "*Disability*" means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are: 1. continuously unable to engage in any occupation for which *You* are or become qualified by education or training or experience; and 2 [are not in fact working]."

"Injury" was defined as "bodily injury caused by an accident which results, directly and independently of all other causes, in *Disability* which begins while *Your* coverage is in force." "Sickness" was defined as "sickness or disease causing *Disability* which begins while *Your* coverage is in force." The required proof of loss under the policy included:

> "4. Proof that *You* are receiving *Appropriate and Regular Care* for *Your* condition from a *Doctor* . . . .
> 5. Objective medical findings which support *Your Disability*. . . .
> 6. The extent of *Your Disability*, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*."

The policy also provided, "The Plan Administrator has the discretionary authority to determine eligibility for benefits and to construe the terms of the Plan."

On July 30, 2002, a vocational expert at Continental conducted a vocational review to determine whether Havens was disabled from "any occupation," as required for coverage beyond one year. After summarizing medical information from Havens's file, she concluded:

> "Based on the claimant's age, work history, education, geographical

location and function, claimant is able to perform the following alternative occupations: Project/Construction Manager, Supervisor-Property Inspection and Sales- Building Materials. These occupations exist at a gainful wage in claimant's geographical location."

On August 22, 2002, an internal secondary review concluded, "Agree," without further explication.

On August 26, 2002, Continental sent Havens a letter denying him long-term disability benefits. The letter stated:

> "Based on your physical restrictions and limitations, you were not able to perform the physical requirements of your own occupation as a Commercial Insurance Property Reinspector, however, based on your level of function with said restrictions, your age and education as well as a labor market survey, you have the capacity to return to gainful work within the restrictions provided.
> In order to determine other vocational alternatives, which may be available to you, we referred your file for a vocational review.
> Based on your physical limitations as well as taking into account your age, education, training, and past work experience, we have identified several jobs, which exist in your geographic area that would be consistent with the parameters cited above.
> These jobs are as follows:
> 1. Project/Construction Manager
> 2. Supervisor-Property Inspection
> 3. Sales-Building Materials
> These Occupations would represent a reasonable level of gainful employment."

Continental terminated Havens's disability benefits as of August 5, 2002, but stated, "In good faith, we are going to pay your benefits for one month through 9/5/02."

On October 22, 2002, Havens wrote to Continental requesting reconsideration. Continental reviewed the letter and its attachments, resulting in a file notation on November 4, 2002:

7

"Based on the information presented, EE has some noted findings in his lumbar spine area which may cause restricted motion in a manual type job. However it is unclear why EE would not be able to perform alternative type work as stated in his termination letter."

On December 10, 2002, Continental denied relief. This time, the denial letter stated:

"After a comprehensive review of your client's claim file, we acknowledge that his test results do show abnormalities that would cause some limitations in his functional ability. We further acknowledge that your client would not be able to perform the material and substantial duties of his own occupation that included heavy lifting, bending, and stooping as previously stated in CNA's letter dated 8/2/602. However, the evidence presented revealed that both Dr. Freese and Meller revealed that your client's lower extremity strength and sensation was intact and Dr. Meller noted that your client was able to move about without signs of discomfort. We also relied on the expertise of CNA's vocational assessment that concluded that based on the evidence presented your client would be able to perform any occupation and provided a sample of these types of occupations, not all-inclusive, that were listed in CNA's previous letter dated 8/26/02. We would like to note that although the letter dated 8/26/02 indicated that a labor market survey was performed, this was labor market research and not a formal labor market survey."

On July 12, 2004, Havens filed suit in the U.S. District Court for the Eastern District of Pennsylvania. He alleged wrongful termination of his long-term disability benefits, wrongful termination of his life insurance, and bad faith. He filed an amended complaint on November 1, 2004 removing the allegation of bad faith. Both sides' motions for summary judgment were denied on February 24, 2005. After what the parties describe as a bench trial, which consisted solely of oral argument on the administrative record, the District Court made findings of fact and law and entered judgment in favor of Continental on June 7, 2005. Havens timely filed this appeal.

**III.**

8

This case arose under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), which gives a claimant a cause of action to enforce the terms of a benefits plan. Remedies include both an award of past benefits due and a declaration of the claimant's right to future benefits. The District Court had jurisdiction under 29 U.S.C. § 1132(e)(1). We have appellate jurisdiction under 28 U.S.C. § 1291. "In an appeal from an ERISA bench trial, we review findings of fact for clear error but have plenary review over the District Court's conclusions of law." Vitale v. Latrobe Area Hosp., 420 F.3d 278, 281 (3d Cir. 2005).

With regard to the standard of review to be applied to the plan administrator's decision, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where, as here, the plan does give the administrator such discretionary authority, we instead review the administrator's decision under an arbitrary and capricious standard of review. Id. at 111. This exception has an exception of its own. "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Id. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)).

We explained this "conflict of interest" language in Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000). There, we held that when an insurer (rather

9

than an employer) both funds and administers a plan, it operates under a conflict of interest justifying a heightened standard of review. Id. at 390. The exact degree by which the review is heightened over the baseline of deferential arbitrary and capricious review is to be evaluated on a sliding scale, "allow[ing] each case to be examined on its facts." Id. at 392. Relevant factors include "the sophistication of the parties, the information available to the parties, and the exact financial arrangement between the insurer and the company." Id. Pinto also pointed to "the current status of the fiduciary," id., by which it meant concern for whether the fiduciary was operating in an environment in which incorrect adverse decisions would not come back to haunt it because, for example, the company was breaking up or laying off many of its employees, disrupting normal relationships. One further factor to be considered is "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." Kosiba v. Merck & Co., 384 F.3d 58, 66 (3d Cir. 2004).

In this case, few if any of these factors beyond the basic financial conflict of interest are at work. The normal difference in sophistication between an insurer and a claimant, present here, does not by itself raise much suspicion. Stratton v. E. I. DuPont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004). Havens argues that Continental made its decision on the basis of limited information, but Continental's case file contains hundreds of pages of office notes, test results, and opinions from Havens's doctors. Numerous Continental employees communicated with Havens and his doctors and closely evaluated the medical evidence. Similarly, nothing in the record suggests to us that there

10

is anything troubling about the financial relationship between Continental and CNA; the relationship does not seem to be anything other than a garden-variety third-party-administered group disability insurance plan.  Finally, there is no evidence apparent to us of procedural irregularity or bias in Continental's internal decision-making process.

We, therefore, apply only a low to moderate degree of heightened scrutiny, near the arbitrary and capricious end of the sliding scale.  "The routine legal meaning of an arbitrary and capricious decision is . . . a decision without reason, unsupported by substantial evidence or erroneous as a matter of law."  Id., at 255 (quoting Pinto, 214 F.3d at 392).  The administrator's decision should receive "some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict."  Id. at 256 (quoting Doe  v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993)).  The burden of proof remains with Havens.

## IV.

The finding that Havens was capable of performing alternate occupations was arbitrary and capricious. The irreducible logical core of such a finding is that a claimant has a residual functional capacity that equals or exceeds the functional requirements of a feasible alternate occupation. These two determinations—the claimant's capacity and the occupation's requirements—must together be detailed enough to make rational comparison possible. Otherwise, the "finding" that the claimant can perform alternate occupations consists only of a bald assertion.

Continental made neither determination. As to Haven's physical capacity, Continental had before it the opinions of Dr. Cohen, Dr. Boucher, and Dr. DeMasi, all of whom indicated specific and stringent restrictions on the work Havens could perform. On any fair reading of their reports, Havens had little ability to lift even very light objects, required great freedom to shift positions, and could not work more than four hours in a day. Continental's letters denying benefits neither adopt these restrictions nor attempt to identify a less stringent set. The letters were simply silent on the matter. While they show that Continental had before it substantial medical evidence, they do not connect that evidence to Haven's actual physical capacity.

Continental argues that Dr. Meller's findings, as described in the denial letters, supported its conclusion that Havens was not disabled. Dr. Meller, however, limited his opinion to discussing whether Havens was disabled *as a result of the October 1999 injury*. That question would have been determinative in the workers' compensation

12

litigation, but it is not the ultimate issue here.  Dr. Meller wrote, "*If not for his unrelated and pre-existing medical conditions*, he would be able to climb roofs, climb ladders, and place himself in awkward positions," (emphasis added) and, "Although [Havens] *does have severe significant disabling problems* with regard to his back, his bladder, his leg, and his neck, none of these things are in any way related to his work injury." (emphasis added)  His reports cannot be read as finding that Havens was not disabled.

As to the physical requirements of the proposed alternate occupations, the record is equally silent.  Neither denial letter does more than list the names of the occupations.  The letters do not discuss the physical requirements of the occupations, do not describe the occupations in any way, and do not name any other source that might provide such information.  They do not even explain how Continental's vocational expert selected these occupations.  The expert's report simply listed a few general factors considered and then named the three occupations.  Continental may reasonably rely on its vocational experts to help it identify alternate occupations, but it is not rational to defer to such experts in the absence of a threshold indication that their conclusions, in the words of Federal Rule of Evidence 702, are the product of "reliable principles and methods . . . applied . . . reliably to the facts of the case."

The absence of a specific determination of a claimant's capacity or a proposed occupation's requirements need not always be problematic.  If it were clear, for example, that the claimant's disabling restrictions conflicted only with the idiosyncratic requirements of his own previous occupation, it might be superfluous to spell out the

13

requirements of the named alternate occupations. But where, as here, the claimant's disabilities are indisputably substantial, the insurer has done nothing to rule out extraordinarily rigorous restrictions to be found in the record, and the proposed alternate occupations consist merely of unexplained job titles, accurate comparison is impossible. Accordingly, Continental's denial of benefits was arbitrary and capricious. We hold that, on the record presented here, Havens is "disabled" from "any occupation," as those terms are used in his contract of long-term disability insurance with Continental. We will reverse the judgment of the District Court and will remand with instructions to enter the appropriate judgment for Havens.