**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0395n.06

No. 13-1052

**FILED**

May 30, 2014

DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LUANN GILLESPIE, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| LIBERTY LIFE ASSURANCE COMPANY OF | ) | |
| BOSTON and THE NATIONAL CITY | ) | |
| CORPORATION LONG TERM DISABILITY | ) | |
| PLAN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: ROGERS, STRANCH, and DONALD, Circuit Judges.

ROGERS, Circuit Judge. Appellant Liberty Life Assurance Company of Boston (Liberty) wrongly concluded that Appellee Luann Gillespie did not meet the definition of "totally disabled" under National's Long Term Disability Plan (Plan). The district court correctly so ruled.

Gillespie began working for National City Corporation (National) as a bank teller in 1998. She held that position until July 2007 when she underwent a lumbar laminectomy and limited fusion to correct back and leg pain. As a full-time employee at National, Gillespie was eligible for long-term disability benefits under the Plan. To continue receiving benefits after an initial two-and-a-half-year period, Gillespie had to show that she could not "perform the duties of any other occupation for which [she was], or could become, qualified by education, training or experience."

Following her surgery, Gillespie did not return to work, but she was eventually approved to return on a part-time basis with restrictions imposed on her activities. Gillespie continued to experience pain and reported that working exacerbated her condition. Because of her stalled progress, Dr. Adams, the physician that had performed Gillespie's surgery, referred her to Michigan Spine & Pain for an evaluation. She visited on June 4, 2008 and was examined by Dr. Marvin Bleiberg and Dr. Harman Ruiz. Dr. Bleiberg administered an EMG which indicated that Gillespie suffered from a "left S1 radiculopathy" (radiating nerve pain on the left side of her body). During Dr. Ruiz's evaluation, Gillespie reported her pain level as five out of ten, that she could only work four hours a day because of pain, and that reclining helped lessen her pain while sitting or standing aggravated it. Dr. Ruiz diagnosed Gillespie with Lumbar Post Laminectomy Syndrome (back pain that develops post-surgery) and prescribed a pain patch and physical therapy. Gillespie attended a few physical therapy sessions with Dr. Michael Barrett, but eventually stopped going because the therapy exacerbated her pain. At that point she stopped using her pain patch because it made her nauseous and began taking Vicodin and occasionally oxycodone.

On July 1, Dr. Adams wrote a letter explaining that although Gillespie "has continually asked to return to work in some capacity, even on a part-time basis, it seems detrimental to her and causing more and more pain" and recommended that she not return to work. His reports indicated that her condition improved after she stopped working, but that she still continued to experience back pain.

In late 2008 and early 2009, Liberty began a heightened review of Gillespie's eligibility for long-term benefits. This was apparently triggered by the fact that she reported that her condition had improved after she stopped working, had been seeing her doctors less frequently, and had stopped filling prescriptions for pain medication or muscle relaxers. On January 6, 2009, Gillespie visited Dr. Caldwell, her primary care physician. After the examination, he submitted a restrictions form that, without elaboration, stated that Gillespie was disabled. Liberty also obtained an updated Activities Questionnaire from Gillespie that stated that she could perform activities such as dressing herself, bathing, and managing her finances by herself. But the Questionnaire also revealed that she could not cook without assistance and that her husband and sister-in-law had to do the grocery shopping and clean the house. Gillespie saw Dr. Adams for a reevaluation on June 2, 2009. That meeting revealed that Gillespie continued to experience pain, and included a discussion of the possibility of new surgery. The meeting also revealed that Dr. Adams thought further surgery "may not be of any significant value" and that "unfortunately this may be her maximum improvement."

In June 2009, Liberty commissioned an independent medical examination (IME) by Dr. Amarish Potnis. After examining Gillespie and reviewing her medical records, Dr. Pontis' report indicated that he believed Gillespie could work in a sedentary position so long as the job involved lifting no more than ten pounds, a sit-to-stand option, and no frequent twisting or turning. His evaluation also confirmed that she experienced back pain and that his observations "were consistent with reported impairments and [that] the patient's subjective findings were substantiated by medical evidence." Thereafter, Catherine Chandick conducted a vocational assessment that considered

Gillespie's work experience, education, and Dr. Pontis' evaluation in order to determine whether she could work in any capacity. It concluded that Gillespie could perform a sedentary occupation such as "Cashier" or "Information Clerk." Based on this vocational analysis, the fact that Gillespie had not filled new prescriptions, and that she had been seeing her doctors less frequently, Liberty concluded that Gillespie did not meet the "any occupation" disability standard and terminated her benefits on July 23, 2009.

Thereafter, Gillespie retained counsel to appeal Liberty's decision. Alongside her appeal, she included two "Statements of Disability" from Dr. Caldwell and Dr. Adams. Both opinions stated that Gillespie "is totally and completely disabled as a result of her medical disabilities and is unable to perform the material and substantial duties of any full-time employment." Gillespie submitted an additional progress note from Dr. Adams that explained that she had been trying not to take pain medication and was "trying to be as active as she [could] be at home." In that note, Dr. Adams expressed pessimism about Gillespie's being able to handle a sedentary position and explained that "she really cannot work certainly not more than 4 hours." He explained that requiring Gillespie to return to work would "be a major mistake" that could exacerbate her condition. However, Dr. Adams ultimately agreed to Gillespie returning to work, stating "so be it."

In response to Gillespie's appeal, Liberty submitted her file to Dr. Philip J. Marion for an additional independent "paper review" that did not involve an in-person examination. After reviewing Gillespie's file, Dr. Marion concluded that Gillespie indeed suffered from chronic back pain and a degenerative spine disease, but that these conditions did not prevent her from working

full time.  Liberty then commissioned a second vocational skills analysis, this time performed by James Miller.  Like Chandick's evaluation, the vocational skills analysis considered Gillespie's work experience and Dr. Marion's report.  Also like Chandick, Miller concluded that Gillespie could perform sedentary, full-time work.  Possible positions included: customer service representative, new account clerk, order clerk, information clerk/receptionist, or cashier.  Based on this report, Liberty affirmed its termination of Gillespie's  long-term disability benefits on March 17, 2010.

Approximately one month after Liberty's denial of Gillespie's appeal, she sued under 29 U.S.C. § 1132.  Both parties made cross-motions for judgment on the administrative record.  The district court held that Liberty failed to carry its burden to prove that the Plan documents contain the necessary clear and express grant of discretion to Liberty, and the court therefore conducted a de novo review of Liberty's denial of benefits.  The trial court first weighed the medical evidence offered by both parties and then the vocational analyses performed by Liberty.  The district court found Liberty's evidence lacking—the court concluded that the evaluations of Gillespie's treating physicians were more accurate than Liberty's IMEs and that the vocational analyses did not adequately consider Gillespie's functional limitations or explain their reasoning.  Thus, the district court concluded that Liberty improperly terminated Gillespie's benefits and ordered reinstatement of benefits with prejudgment interest.

The parties dispute the proper standard of review under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), with Liberty arguing for the more deferential "arbitrary and capricious" standard and Gillespie supporting the district court's determination that de novo review applies.  *See*

*Shy v. Navistar Int'l Corp.*, 701 F.3d 523, 529–30 (6th Cir. 2012) (noting that "[t]he question of whether deference is due relies entirely on whether discretion has been expressly granted in the plan for the specific decision at issue because discretion is the exception, not the rule, and unless the plan grants discretion, the court should review the actions of the administrator *de novo*." (internal quotation marks omitted)).  Review of Liberty's actions under the more deferential arbitrary and capricious standard reveals that Liberty wrongfully terminated Gillespie's benefits.  Thus, we need not reach the standard of review dispute because Liberty's termination of Gillespie's benefits was improper under either standard.

Liberty's sole reliance on the cursory opinions of its independent medical examiners to determine Gillespie could perform sedentary work was, on balance, arbitrary and capricious.  A plan administrator is of course permitted to rely on the opinions of its doctors or hired consultants and does not need to "accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  But that does not mean that the administrator can "arbitrarily refuse to credit a claimant's reliable evidence." *Id.* at 834.  The record indicates that is what happened here.  There is nothing in the record that suggests Liberty or its doctors gave any weight to the evidence from Gillespie's doctors that tended to show Gillespie could not work in a full-time capacity—even in a sedentary occupation.

Dr. Potnis' analysis ignored the opinions of Gillespie's treating physicians.  His report claimed  that he "review[ed] the records provided  . . . .  includ[ing] records from Dr. Adams," but failed even to acknowledge that Gillespie's treating physicians disagreed with his conclusion, much

less explain how he arrived at a different diagnosis than they did. Without at least some sort of explanation for his dismissal of the conclusions of Gillespie's treating physicians, reliance on Dr. Potnis' report was not "the result of a deliberate, principled reasoning process . . . supported by substantial evidence." *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008) (internal quotation marks omitted).

The second independent medical evaluation from Dr. Marion, although slightly more thorough, suffers from similar deficiencies. As we have explained, "[t]he failure of . . . independent-review physicians . . . to explain why they [have] disregarded the opinions of [treating doctors is] arbitrary." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007) (citing *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 170–73 (6th Cir. 2007). Dr. Marion's report stated that the conclusions of Gillespie's physicians were "inconsistent with the claimant's otherwise stable lumbar spine impairment and lack of objective findings via neurological examination." At worst this statement is a mere assertion unaccompanied by any explanation; at best it fails to address the fundamental concern of Gillespie's treating doctors: Gillespie had tried working before and, despite attempting a number of different pain management techniques, experienced exacerbated back pain while working. Dr. Marion's report does not indicate that he even considered that returning to work would exacerbate Gillespie's condition as it had in the past. Further calling into question the thoroughness of Dr. Marion's review was the fact that he concluded that Gillespie was "functionally independent with activities of daily living." While Gillespie reported being able to perform activities like bathing and dressing by herself, she was unable to shop for groceries, cook, or clean

by herself—chores that clearly constitute "activities of daily living." Finally, while "a file review does not, standing alone, require the conclusion that [the administrator] acted improperly, . . . the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). The fact that Dr. Marion never actually examined Gillespie also cuts against the reliability of his opinion.

Perhaps even more problematic is the fact that there is no indication that Liberty gave any consideration to the contrary medical conclusions of Gillespie's doctors. The vocational analyses, which Liberty used to determine that Gillespie could perform certain sedentary occupations and therefore was not "Totally Disabled," only referred to the evaluations conducted by Dr. Potnis and Dr. Marion. There is no indication that the analysts were aware that Gillespie had submitted contrary medical evidence, nor do the denial letters Liberty sent suggest that the evidence was given any weight. Liberty's exclusive reliance on the reports of Dr. Potnis and Dr. Marion would have been less problematic if the doctors had addressed the contrary medical evidence and explained why they were disregarding it. But since they did not, and there is nothing in the record indicating that anyone at Liberty considered Gillespie's evidence either, we are left to conclude that Liberty arbitrarily refused to credit Gillespie's contrary evidence.

Further, the vocational aspect of Liberty's determination was deficient. As the Third Circuit has explained:

> The irreducible logical core of [a finding that the claimant could perform an alternative occupation] is that a claimant has a residual functional capacity that

> equals or exceeds the functional requirements of a feasible alternative occupation. These two determinations—the claimant's capacity and the occupation's requirements—must together be detailed enough to make rational comparison possible. Otherwise, the 'finding' that the claimant can perform alternate occupations consists only of a bald assertion.

*Havens v. Continental Cas. Co.*, 186 F. App'x 207, 212 (3d Cir. 2006). The Third Circuit concluded that "accurate comparison" of the claimant's capacity with the requirements of the alternative occupations was impossible " where . . . the claimant's disabilities are indisputably substantial, the insurer has done nothing to rule out extraordinarily rigorous restrictions to be found in the record, and the proposed alternate occupations consist merely of unexplained job titles." *Id.* at 213. This appears to be the case here. Although there was disagreement between Gillespie's and Liberty's doctors over whether she can return to work at all, they all agreed that, were she to return, stringent restrictions on her activities would have to be imposed. But the vocational analyses provided by Liberty simply list the names of proposed occupations. The analyses do not discuss the physical requirements of the proposed occupations (beyond the fact that they are sedentary), provide a description of the occupation beyond its name, or explain how the individual conducting the analysis concluded that Gillespie could perform the proposed occupation.

Arbitrary and capricious review is deferential, but the vocational analyses conducted by Liberty lack sufficient analysis or other information to permit a rational comparison between Gillespie's capabilities and the proposed occupations. Arbitrary and capricious review does not require accepting unreasoned conclusions. Without more, we cannot say that Liberty's decision was "the result of a deliberate, principled reasoning process . . . supported by substantial evidence."

*Bennett*, 514 F.3d at 553 (internal quotation marks omitted).

Liberty's termination of Gillespie's benefits was improper under either arbitrary and capricious or de novo review because Gillespie satisfied the definition of "totally disabled" under the Plan. Accordingly, we AFFIRM the judgment of the district court.