NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0324n.06

Case No. 20-6318

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| LISA HOLDEN, | ) | **FILED** |
|  | ) | Jul 08, 2021 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
|  | ) |  |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | ) |  |
|  | ) |  |
|  | ) | OPINION |
| Defendant-Appellee. | ) |  |
|  | ) |  |

**BEFORE: GIBBONS, COOK, and DONALD; Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge**.

In this case for long-term disability benefits brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*, Plaintiff-Appellant Lisa Holden appeals the denial of long-term disability benefits under her plan with her former employer, Williams & Connolly, LLP and its administrator, Defendant-Appellee Unum Life Insurance Company of America. For the foregoing reasons, we affirm.

## I. BACKGROUND

### A.   Holden's Employment at Williams & Connolly

Lisa Holden worked as an assistant controller at Williams & Connolly, LLP in Washington, DC from 1997 to 2005, at which time she was promoted to Deputy Director of Finance. In that

new position, Holden was in charge of all tax reporting for the firm and oversaw six pension plans, the firm's financial reporting, and accounts payable. Holden reported that she had "chronic stress" while working at Williams & Connolly, and that the "workload [was] so much." Given the "low head count" in the accounting department, Holden claims that she and others in accounting had to "pick up all the slack," and as a result, she worked excessive hours. She claims one boss told her she should wait to have another child, given the number of hours she worked.

The hours and workload were not the only problem. Holden reported that despite the nearly two decades she dedicated to the firm, "they did not show any dedication to her." She described her time at the firm as "traumatic" and explained that she experienced bullying, abuse, and harassment including sexual harassment from the firm's executive director in the early 2000s. Holden reported to HR issues in the accounting department which largely appear to be based on Holden's interaction with two other employees.[1] For example, Holden claims that the two employees met with her boss in a "secret meeting" after which Holden was passed up for a promotion. At one point in 2013, Williams & Connolly had a consultant come in, and that consultant reported that she "could see all the vitriol and anger" that the two other employees displayed toward Holden and noted "what a bad environment" it was for Holden.[2] Holden maintained that she "worked incredibly hard" but that others at the firm "denigrated her by telling her the only reason they liked her was because she worked so hard." She claimed she was

---

[1] The problems at work did, however, extend beyond those two employees. In addition to the alleged sexual assault described above, Holden reported that another finance director told Holden she should work alone and that she would not talk to Holden anymore. Holden also claimed that at one point, her boss told her that her salary was not commensurate with her position, and others in the department "got really upset about it" and "told her she would never be the boss of her department." After she took a day off in August of 2015, she claims that when she returned, she was unable to access certain drives on her computer which made Holden feel like her coworkers were "playing games" with her.

[2] One short-term disability report notes that this consultant came in specifically to try to "fix" Holden's relationship with those two particular coworkers.

"alienated completely," and that her superiors "yanked out all of her authority" without any concomitant decrease in responsibility. Holden felt she was withdrawing from others in her life when "these years of abuse at work started to kick in."

### B.    Holden's Leave and Medical Evaluations

After reporting the above, Holden told Unum that "all of these little things" came together and led her to leave work. She left because she was "feeling sick and anxiety-ridden" and because she felt her employer did not want her that and that it was "time to go." She reported to Unum that she spent her time "thinking about all of the abuse at work and trying to process it," feeling that she had nowhere to go. On August 12, 2015, Holden contacted her primary care physician, Dr. Lucy Chang, who suggested Holden leave work. Holden's last day at Williams & Connolly was August 14.[3]

Two days before her departure, Holden applied for short-term disability benefits with Unum. In speaking with Unum, Holden reported anxiety, tearfulness, nightmares, tremors, an inability to focus, insomnia, fatigue, social withdrawal, a sense of impending doom, and poor appetite. Holden also explained to Unum that she "thinks it's primarily the work situation . . . most of her hours are spent at the office."[4] Holden then obtained evaluations and treatment from

---

[3] Holden took leave through the Family Medical and Leave Act ("FMLA"). As described in her complaint, Holden took this leave "due to these conditions." In their response brief before this Court, Unum claims that "these conditions" refers to "her adverse work environment at Williams & Connolly," in other words, the conditions *of the workplace*. That is a misreading of Holden's complaint; the only "conditions" that Holden could refer to in paragraph 16 are the "anxiety and depression" listed in the prior paragraph. In fact, nowhere in the complaint does Holden refer to any actual *conditions* at work, much less any allegation of a hostile work environment. At bottom, "conditions" refers to her anxiety and depression, not any conditions of the workplace.

In any event, Holden remained covered under her Unum plan up to and including December 10, 2015, as conceded in Holden's complaint. After that date, Holden had no coverage for any *new* claims.

[4] Holden received her short-term disability benefits beginning on August 29, 2015. Unum then rolled over her claim for short-term disability benefits into one claim for long-term benefits.

two treating physicians—Dr. Chang and Dr. Fischer—whose evaluations and conclusions formed the basis of Unum's initial long-term disability denial.

> i.   *Dr. Chang's Initial Evaluation*

Holden's primary-care physician, Dr. Chang, first examined Holden on August 24, 2015. She described Holden as presenting with a diagnosis of stress-related anxiety and as feeling "very stressed from work." Holden reported having nightmares and feeling anxious "because of altercations at work." Dr. Chang reported that Holden was "feeling somewhat better" but still had a low mood, persistent sadness, forgetfulness, anger, hypervigilance, and a feeling of victimization. She also noted that Holden was recently "passed up for a long expected promotion[.]" In her attending physician statement provided to Unum, Dr. Chang diagnosed Holden as suffering from "anxiety and situational depression."

> ii.   *Dr. Fischer's Psychiatric Evaluations*

Throughout the fall of 2015, Holden visited a psychiatrist, Dr. David Fischer. On August 20, 2015, Holden first reported to Dr. Fischer that she thinks she has "complex PTSD." Fischer's chart notes that Holden has "been abused by the assistant director. . . Does not get spoken to by a peer. Her boss does not do anything about it. She believes they are trying to eliminate her." In that initial evaluation, Dr. Fischer noted that Holden's thought process was within normal limits and that she presented as "organized[,] [g]oal [d]irected, [c]oherent, [and] [l]ucid." He also noted the absence of any obsessions or phobias. He did note that PTSD was present, given an "[a]busive relationship at work." He then implemented a treatment plan including psychoeducation, psychotherapy, and psychiatric medication. In an FMLA certification form on August 26, 2015, Dr. Fischer noted that Holden was "presently incapacitated" and that her condition would render her "unable to perform work of any kind." On September 5, in a separate response to a

questionnaire from Unum, this one for her short-term disability claim, Dr. Fischer responded to a question asking whether Holden's "condition [was] due to sickness involving the patient's employment" in the affirmative, saying that her condition was due to "stress related to work."

On September 24, 2015, Holden reported to Dr. Fischer that she was improving, "[f]eeling less depressed, and "[had] ambivalent feelings about her job." Dr. Fischer noted that the "[p]sychosocial stressors [were] manageable[.]" He also wrote that Holden displayed logical, realistic thinking with no noted abnormalities present. Holden's "judgment concerning everyday activities and social situations [was] intact" and she "[was] developing the ability to accurately perceive and recognize the consequences of her behavior." He did, however, describe her depressed mood, insomnia, poor appetite, and poor concentration.

On September 30, Dr. Fischer noted that Holden's psychosocial stressors—"manageable" a week before—were now "overwhelming." Her symptoms included anxiety, depression, sadness, and low energy. On October 7, Holden reported "feeling a little better" although she was not sure if she was ready to return to work. Her psychosocial stressors remained "overwhelming."[5] On October 13, she reported largely the same—feeling better but with overwhelming stressors—but Dr. Fischer did note that it had "become apparent that work does not want her to return." On October 19, she again reported feeling a little better and had more energy, and her psychosocial stressors were back to "manageable." She did, however, report poor focus and concentration and "ruminat[ed] about treatment at work."

---

[5] In Holden's short-term disability claim file, Unum notes that a representative spoke with someone at Williams & Connolly on October 8, 2015. In that call, the person from Williams & Connolly "reported [Holden] had a lot of family issues that built up and[,] and there were a lot of work issues that were not work-related issues. [Williams & Connolly] thinks [Holden] was displaying paranoia." Holden takes issue with the fact that this call with a Williams & Connolly representative (as part of her short-term disability file) was not included in her long-term disability file, a claim we address below.

On October 22, Dr. Fischer responded to a Unum questionnaire about Holden's condition. He diagnosed her with "Major Depression Single Episode" and PTSD. He explained that Holden "has poor concentration and [an] inability to focus—anxious—not thinking in a goal directed manner." When asked whether Holden's condition was "caused by, contributed by, or exacerbated by [her] employment," Holden answered in the affirmative, explaining that Holden "feels that she was in an abusive relationship at work[.]" He continued, explaining that Holden had become depressed with low self-esteem and "[f]eels she has been displaced by others at work." He described Holden as unable to plan and organize information and as unable to "function at her current work situation due to poor memory and poor concentration and a lack of support from management." Dr. Fischer also answered that Holden would not—"at this time"—be able to perform the same occupation with a different employer. Dr. Fischer did not write anything in the subsequent question asking for an explanation of his rationale for answering this question in the negative.

On October 26, Dr. Fischer noted that Holden "[c]ontinues to ruminate about her treatment at work." Her focus and concentration remained poor, but she was now sleeping and eating well. That same day, Dr. Fischer completed a form from Unum in which he wrote that Holden feels "emotionally numb" and that he does not think that Holden would be able to perform the demands of her occupation with a different employer at that time. When asked to explain why Holden would not be able to work for a different employer, Dr. Fischer wrote that "[Holden] has become depressed—low self-esteem[.] Feels she has been displaced by others at work." He also wrote that Holden "cannot function at her current work situation" due to poor memory, poor concentration, and "lack of support from management." On November 5, Dr. Fischer's charts note that Holden was "still having difficulties concentrating and organizing her thoughts" and was "still

puzzled about what has occurred at work." Holden felt that "her health ha[d] been negatively impacted by all the emotional turmoil." On November 10, Holden was "[s]leeping ok, [experiencing] crying spells, ruminating about [her] job, wondering how things turned out so badly. She rumminates [*sic*] about her boss['s] behavior." On November 26, Holden continued to "ruminat[e] about situation at work. Wonders what was going on?" She "ruminate[d] about her boss allowing people to go above her without following correct protocol."

### C.      Unum's Review and Denial of Long-Term Disability Benefits

When she left Williams & Connolly, Holden was covered under the firm's long-term disability insurance plan through Unum. To qualify for disability benefits for the first 36 months, the policy requires that the insured be "**limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**" and "have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury." The plan defines "regular occupation" as the "occupation you are routinely performing when your disability begins." Importantly, the plan notes that in considering a claim, "Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." In other words, the insured must be disabled from performing their regular occupation for *any* employer, not just their *specific* employer.

Unum received the medical documentation from Dr. Chang and Dr. Fischer and conducted its own review, ultimately leading to the denial of Holden's long-term disability claim. On November 30, 2015, a Unum representative noted in Holden's file that "[t]he precipitant to [Holden's] work stoppage appears to be specific to her workplace. It is not clear from the file documentation that the reported symptoms would preclude [Holden] from performing the demands of her occupation with a different employer." Unum referred the file for further review from

several consultants and physicians including Paul Burgos, LSW; Dr. Nicholas Kletti; and Dr. Stuart Shipko.  Each reviewed Holden's file and concluded that her inability to work was specific to conditions at Williams & Connolly such that Holden did not demonstrate she was precluded from performing the job "as it is normally performed in the national economy."

### i.  *Paul Burgos*

Paul Burgos, Unum's Senior Clinical Consultant, conducted the initial review.  On December 7, 2015, he reviewed the medical records from Dr. Chang and Dr. Fischer.  Burgos summarized the findings of Dr. Fischer and Dr. Chang, concluding that:

> Although [Holden] presented to treatment with complaints of stress and situational depression, her symptoms are specifically related to her prior workplace and abuse/mistreatment that she perceives . . . Based on my review of the clinical documentation[,] I do not find support for a decrease in functional capacity that would preclude [Holden] from performing the demands of her occupation due to a severe and debilitating psychiatric illness.  The primary barrier to returning to work appears to be specific to her prior workplace.

Burgos pointed to Dr. Chang's diagnosis of *situational* depression and anxiety, Dr. Chang's finding that "the condition was related to the insured's employment," and Dr. Chang's notation that Holden's "stress [was] related to work."  Burgos also pointed to Dr. Fischer's finding that Holden was "very stressed from work" and that "the condition is related to her employment."  Burgos did, however, note that, based on Dr. Fischer's Work Capacity Narrative, Dr. Fischer "does not . . . feel that [Holden] would be able to perform, the demands of her occupation with a different employer at this time."  Burgos decided to refer Holden's file to "behavioral health OSP" for further review.

### ii.  *Stacy Mears*

On December 10, 2015, Holden spoke at length with Stacy Mears, a Unum Disability Benefits Specialist in charge of Holden's long-term disability claim.  In that conversation, Holden

provided many of the details regarding her treatment at work. After describing her negative experiences at work, Holden explained that "all of these little things coming together led to [Holden] going out of work." Holden explained that she was working 10-12 hours per day and "was thinking about all the abuse at work and trying to process it and . . . had nowhere to go." When Mears asked if Holden's conditions were preventing her from working, Holden replied affirmatively, stating that her "mental health [was] preventing her from working." Mears asked about Holden's daily activities; Holden answered in part that "she has been doing a lot of researching of office abuse and office mobbing and sexual harassment" and "has not decided if she will file suit against" Williams & Connolly.[6]

### iii. *Dr. Nicholas Kletti*

Per Burgos's referral, Dr. Nicholas Kletti, a psychiatrist, then reviewed Holden's file on December 15, 2015. Dr. Kletti concluded that the "[r]ecords document that claimant's going out of work was in the context of workplace-specific stressors[.]" Dr. Kletti focused on Dr. Chang's statement that Holden was experiencing "nightmares and feeling anxious because of altercations at work," and Dr. Fischer's statements that Holden's condition was "[s]tress related to work," and "feels that she was in an abusive relationship at work." Dr. Kletti noted one apparent contradiction in Dr. Fischer's statement that Holden's focus and concentration were not good, that she was not thinking in a goal-directed manner, and that she cannot function at work due to poor memory and concentration. Dr. Kletti explained that this was contradicted by Holden's own statement to Mears that Holden had spent time researching a lawsuit against Williams & Connolly. Dr. Kletti concluded that "[t]o a reasonable degree of medical certainty, I do not find that the file

---

[6] Holden did eventually file a separate suit against Williams & Connolly under the FMLA and ERISA. *Holden v. Williams & Connolly, LLP, et al.*, No. 1:19-cv-03055-KBJ (D.D.C., filed Oct. 6, 2019). Holden dismissed the suit in April, 2021.

documentation of symptom severity, functional impairment, and treatment intensity[7] are consistent with opined impairment precluding ability to perform usual occupational duties, i.e.[,] for a different employer." In other words, Dr. Kletti disagreed with Dr. Fischer to the extent Dr. Fischer found that Holden could perform her occupational duties for another employer.

Dr. Kletti and Dr. Fischer then spoke on January 4, 2016. In a summary of that call, Dr. Kletti memorialized Dr. Fischer's belief that Holden would be unable to work for another employer. Dr. Fischer also noted that Holden reported "PTSD-like symptoms including nightmares and intense memories about prior treatment by her supervisor." Dr. Kletti also noted that Dr. Fischer stated in his sessions with Holden, "she demonstrates somewhat concrete thinking" such as "continually turning discussions back to alleged abuse by prior employer." Dr. Kletti then noted in Unum's internal notes that the call with Dr. Fischer "does not resolve disagreement" (between Dr. Kletti and Dr. Fischer) as to whether Holden's conditions were specifically linked to work or whether she was precluded from working for any employer. Accordingly, Dr. Kletti recommended review by another physician.

### iv. *Dr. Stuart Shipko*

Dr. Stuart Shipko, another board-certified psychiatrist, evaluated Holden's file on January 5, 2016. Dr. Shipko's notes indicate that he considered Dr. Chang's evaluation, Dr. Fischer's evaluations, and Burgos's and Dr. Kletti's reviews of those files. Dr. Shipko concluded that "[w]ithin a reasonable medical certainty, restrictions and limitations are not supported" through the claimed time period. "Office notes from Dr. Fischer," he continued, "are inconsistent with disability information provided by Dr. Fischer." For instance, Dr. Fischer reported to Unum that Holden reported an inability to think in a goal-directed manner, an inability to organize, and poor

---

[7] Here, Dr. Kletti noted the medication and dosage that Dr. Fischer prescribed for Holden.

memory, but Dr. Fischer's chart notes from Holden's office visit also "reflect intact memory and logical, realistic thinking." Additionally, Dr. Shipko noted that Holden in her visits never even complained of poor concentration or focus; indeed, Holden was "capable of working with an attorney, doing a lot of researching of office abuse, and is putting together a complaint. This is inconsistent with impaired concentration and inability to think in a goal directed manner." Dr. Shipko concluded that the "[r]eported inability to work relates to a hostile work environment."

v. *Denial of Long-Term Disability Benefits*

On January 8, 2016, Unum notified Holden that it was denying her claim for long-term disability benefits. Unum concluded that Holden was "able to perform the duties of [her] regular occupation as it is normally performed in the national economy" and that she had "not been disabled as required by the policy since stopping work[.]" Unum continued, "[t]he medical information received indicates your claimed disabling conditions and symptoms were directly related to your specific workplace and the circumstances of your job as performed for your specific employer." Unum noted that Dr. Chang diagnosed Holden with "anxiety and situational depression" and that Dr. Fischer stated Holden's condition was "stress related to work." In sum, Unum found that "issues unique to your specific workplace caused you to stop working and you believe continue to prevent you from returning to work. However, because you are able to perform the material and substantial duties of your regular occupation as it is normally performed in the national economy, you do not meet the policy definition of disability[.]"

**D. Administrative Appeal and Additional Review**

Holden internally appealed that denial, and in the review process, she submitted new records from treating and evaluating physicians. Further evaluations and treatment—and records

sent to Unum—include an evaluation by Dr. Christina Ralph, treatment by Barbara Bradford and Dr. Peter Bernard, and treatment at the George Washington University Hospital.

i. *Dr. Christina Ralph*

First, Holden submitted a neuropsychological examination report from Dr. Christina Ralph which Holden claims verifies that she was totally disabled. Dr. Ralph's report notes that Dr. Fischer referred Holden to her and that her report was based on a review of records and direct interviews with Holden. Dr. Ralph examined Holden on three dates in February of 2016 and issued her report on March 16, 2016. In her evaluation, Holden expressed to Dr. Ralph her frustrations working at Williams & Connolly. Holden noted that the firm "threw [her] under the bus" and "failed to support her in dealing" with employees under her supervision. Holden described her time at the firm as "traumatic" and said that her "whole life's been ruined." Holden described "chronic stress" at the firm, felt like she worked harder than others, and felt that she was "overloaded with work." Holden did express a desire to find another job, albeit "a position that does not involve interaction with coworkers."

Holden reported to Dr. Ralph that she had experienced memory and cognitive issues over the prior year. Dr. Ralph noted that these "cognitive difficulties were attributed to the chronic stress of working in a 'hostile work environment.'" Dr. Ralph noted again that Holden's time at Williams & Connolly was "traumatic," this time adding that Holden "has been withdrawn from people and has avoided situations that remind her of her former workplace." Holden reported no other "specific fears or avoidance behavior, with the exception of avoiding her former workplace." Further, Holden reported "no social anxiety when required to give presentations or speak to groups of people" but did describe "anxiety when meeting new people at social events." Holden described

one panic attack near the end of her employment but noted "no significant history of panic attacks" and no specific obsessions or compulsions.

Dr. Ralph then conducted a battery of cognitive assessment measures. In terms of behavioral observations during the testing, Dr. Ralph noted that Holden was "fully oriented and cooperative" and "exhibited excellent motivation and persistence on all tasks." Holden's "[a]ttention and concentration appeared within normal limits." Holden's intellectual functioning was solidly within the average range. Her performance on "objective measures of executive functioning," however, "was inconsistent." Holden displayed no problems with impulsivity or ability to pay attention and also displayed "age-appropriate concentration," but she did exhibit "overall poor planning and organization." Dr. Ralph noted the possibility of ADHD in Holden's "inadequate retrieval of information, despite [a] solid ability to learn and store the information."

Finally, Dr. Ralph reported results from a series of self-reported questionnaires designed to show Holden's "social-emotional functioning and personality features." Holden displayed symptoms of depression and felt "trapped in her current situation, feeling as though she cannot ameliorate the situation." Holden "appear[ed] to attribute much of her depression to unfair and insensitive treatment by others in her life." Dr. Ralph noted a "hypersensitivity to criticism" and a proneness to feeling victimized and acting defensively. Finally, Dr. Ralph noted that any threats to Holden's high expectations for herself "can contribute to significant anxiety" with "current worries centering around her work, her health[,] and her future." In sum, Dr. Ralph noted that Holden has a "history of difficulties" consistent with major depressive disorder, generalized anxiety disorder, social anxiety disorder, and ADHD. Dr. Ralph disagreed with Holden's self-reported possibility of PTSD, noting that "[a]lthough . . . Holden experienced the interpersonal

conflict at her previous job as highly stressful and frustrating, the events do not constitute traumatic events, as defined by the DSM-5."

ii. *Barbara Bradford, LICSW*

Next, Unum received information from Barbara Bradford, a behavioral-health therapist whom Holden visited after leaving Williams & Connolly. Unum requested copies of office notes or treatment logs, but Bradford explained to Unum that she keeps no records other than her own treatment notes, which she does not release. Holden met with Bradford between September 9, 2015 and October 28, 2015 before continuing treatment solely with Dr. Fischer. In her summary letter to Unum, Bradford reported that Holden "presented with high anxiety due to traumatic interactions in her workplace which had been ongoing for many months and had reached a peak in August 2015[.]" Bradford noted that it became clear to her "that the difficult situation she described . . . were actual conditions she faced in her workplace. These circumstances seemed to echo events from her past, making them rise to the level of trauma in her mind." Bradford concurred with Dr. Fischer's contemporaneous diagnoses and evaluations and felt that "Holden would require a particularly supportive work environment as well as continuing supportive therapy to be able to return to regular employment."

iii. *Dr. Peter Bernard*

Holden also sent Unum records from Dr. Peter Bernard, a neurologist who treated Holden from August 2015 to May 2016. In August of 2015, Dr. Bernard noted that Holden complained of "memory loss for random things, and feels there is decrease in functioning of her executive skills like learning." Holden described "having constant problems at work" and feeling that "people at work . . . are in a clique and have something against her." On September 10, 2015, Dr. Bernard's notes indicate that Holden exhibited "PTSD, major depressive disorder, and anergia

presenting with memory retention issues, difficulty planning and organizing, and gradual memory loss." On February 26, 2016, Dr. Bernard noted that Holden "continues to struggle with PTSD from her work." He explained that Holden "is not sleeping well (can't stay asleep)" but has "[n]o other complaint at this time." On March 25, 2016, Holden reported to Dr. Bernard that she has a history of "PTSD experienced at her work place. She experienced bullying, and mental stress from her coworkers[.]" On April 8, 2016, Holden reported that she had "been bullied and passive aggressively pushed out of her workplace by her coworkers." In that same report, Dr. Bernard noted "no abnormal findings on the physical examination" despite Holden's complaint of numbness on the left side of her body and facial spasms (for which Holden reportedly went to the ER but left before seeing a physician due to the crowd size).

iv. *Dr. Fischer's Update and GWU Hospitalization*

On June 20, 2016, Dr. Fischer sent a letter "at the request of" Holden, regarding Holden's appeal of her long-term disability benefits. Dr. Fischer explained that while "workplace stress certainly aggravated [Holden's] underlying medical conditions, they were not the sole and precipitating cause of her medical conditions and symptoms." "Rather," Dr. Fischer continued, "after careful and close examination and treatment of Ms. Holden, it is clear that underlying and [longstanding] medical and behavioral issues (as found by Dr. Ralph) have generally and adversely affected her cognitive and behavioral skills and are not limited only to her specific workplace."[8] Fischer noted specifically that Holden continues to ruminate about her treatment at work, has difficulty concentrating and thinking in a goal-directed manner, and has an impaired memory. He also explained that since January of 2016, Holden's condition have "been on a downward course."

---

[8] As Unum notes, Dr. Fischer did not provide any new or supplemental evaluations or treatment records in this June 2016 letter.

These conditions, he concluded, "clearly disqualify her from substantially and materially performing the duties of her regular occupation in the national economy in any job setting, not just at her employing law firm." Dr. Fischer also disagreed with Dr. Ralph's failure to diagnose Holden with PTSD. He explained that even if Holden did not explicitly meet the criteria under the DSM-5 for PTSD, her depression and anxiety "are certainly present along the continuum of PTSD symptoms." Dr. Fischer concluded that Holden is prohibited from performing her duties in any work setting "as a direct and proximate result of being depressed, anxious, and suffering from PTSD and not simply any incidental 'work stress' she may have experienced at her current employment (which certainly aggravated her underlying conditions)."

On August 22, 2016, Dr. Fischer wrote again to Unum, this time explaining that Holden was hospitalized at the George Washington University Hospital from August 3 to August 15, 2016 for "paranoid delusions and hyperverbal behavior." Holden's discharge summary notes that she presented to the GWU emergency department "with delusions of being monitored and followed by her former employer,"[9] as well as some possible symptoms of mania including "irritable mood, mood lability, decreased need for sleep, increased goal directed activity[,] and rapid speech." One doctor wrote on August 14 that Holden's "Event Leading to Hospitalization or Eval" was "Work Stress" though other reports more specifically describe her hospitalization as being due to the "onset of paranoia" at allegedly being tracked by Williams & Connolly, which Holden believed was in an attempt to prevent her from obtaining disability benefits. Her hospitalization resulted in new diagnoses of bipolar disorder, acute psychosis[10], delusion, and mania. The final report notes that Holden's manic symptoms could be due to medications prescribed since August of 2015. The

---

[9] Holden reported to her treating physician that she believed that as of a week before her admission to the hospital, Williams & Connolly had "bugged her house" with "espionage software."

[10] At another point, hospital records refer to this as "stimulant induced psychosis."

reports also noted that Holden's thought process was "linear and goal-directed", that her memory was "remote, recent, and . . . grossly intact", and that she had "[g]ood concentration" and a "[n]ormal attention span" though both her insight and judgment were poor. Ultimately, the hospital released Holden when she showed improvement in mood stability and anxiety and decreased concern over any surveillance by her former employer.

v. *Unum's Final Review and Affirmance of Denial*

With this updated information, Unum conducted a final review. First, Dr. William Black, a neuropsychologist and psychologist, evaluated Holden's file, focusing specifically on Dr. Ralph's evaluation, which Unum received from Holden's counsel on June 20, 2016. In his report issued on September 15, 2016, Dr. Black concluded that there was "sufficient information in the written report and summary data form to determine the validity of cognitive and emotional functioning." Dr. Black also concluded that Holden's "emotional factors had a negative influence on [her] test performance," and that "[t]he available evidence indicates that [Holden] generally sees her cognitive functioning as more abnormal than the generally normal test results indicate." Dr. Black's bottom-line conclusion was that "[t]he test data supports . . . Dr. Ralph's conclusions." Dr. Black then returned the file for a "Whole Personal Analysis" conducted by Dr. Brown.

On September 27, 2016, Dr. Peter Brown, a psychiatrist, issued his own findings. Dr. Brown summarized Holden's file up to that point, concluding that Holden's "inability to work relates to a hostile work environment." Dr. Brown analyzed Dr. Ralph's psychological evaluation, agreeing that Holden's attention, visual-spatial construction, verbal fluency, and problem-solving skills were all in the average range. Dr. Brown noted that Dr. Black had reviewed the raw data from that evaluation, agreeing with Dr. Ralph that certain "long-standing personality features" explained Holden's symptoms. Dr. Brown also agreed with Dr. Ralph that a diagnosis of PTSD

was not supported because the stressor cited—"chronic rude and disrespectful behavior by coworkers and lack of support by her supervisor"—was not specifically enumerated in the DSM-5 as a precipitator sufficient to cause PTSD. Importantly, Dr. Brown concluded that Dr. Fischer's newest letter was "not supported by his contemporaneous records through mid[-]summer 2016." Dr. Brown also concluded that Dr. Fischer's "assertions are inconsistent" with Dr. Ralph's testing results which showed "at most . . . mild relative weaknesses that are compensated for by other strengths." Further, Dr. Fischer's assertion of "severe and pervasive impairment" was inconsistent with the "stable low-dose antidepressant regimen" that Holden was prescribed. Dr. Brown did note, however, that so-called "restrictions and limitations" *were* supported as of mid- to late-July "when there was a clear onset of new and severe reported symptoms," referring to the conditions that led to Holden's hospitalization in August of 2016.

On September 30, 2016, Unum affirmed its initial denial of Holden's claim for long-term disability benefits. Unum concluded that "Holden was able to perform the duties of her occupation and that she did not meet the definition of disability[,]" and "[a]s such, she [was] not eligible for benefits." In support, Unum pointed to Dr. Black and Dr. Browns' reviews of Holden's files. The appeal denial reiterated the conclusions that Dr. Brown made regarding (1) the inconsistency between Dr. Fischer's new statements and his contemporaneous medical records, and (2) the inconsistency between the assertion of a severe and pervasive impairment and a low level of medication. The letter did note that Holden displayed a "clear onset of new and severe reported symptoms" from mid to late July 2016, but because Holden's FMLA leave was exhausted as of December 11, 2015, her long-term disability coverage ended that day as well; therefore, there were "no benefits … payable for the period of impairment that began mid to late July 2016."[11]

---

[11] Holden concedes that as of December 10, 2015, she was no longer covered by Unum's long-term disability plan, as her FMLA leave ended as of that date.

### E.    Procedural History

Holden filed suit on February 5, 2019, seeking, in part, damages for disability benefits to which she was entitled through the date of judgment, pursuant to 29 U.S.C. § 1132(a)(1)(B). Holden's motion for judgment on the pleadings and Unum's motion for judgment on the record were referred to a Magistrate Judge who issued his report and recommendation on April 2, 2020. The Magistrate Judge recommended that judgment be entered in favor of Unum because Unum's decision to deny benefits was not arbitrary and capricious. As the Magistrate Judge explained, "[a]lthough Holden offers an alternative interpretation" of her disability, Unum "determined that Holden could not return to her former law firm but could perform her job elsewhere." The Magistrate Judge thus concluded that the Sixth Circuit's "ERISA caselaw requires that courts accept an administrator's decision even if the claimant puts forth a credible, countervailing interpretation of a plan." Over Holden's objections, the district court issued an order on October 19, 2020 accepting in whole the Magistrate Judge's report and recommendation, thereby granting Unum's motion for judgment on the record and denying Holden's motion for judgment on the pleadings. The district court entered final judgment in favor of Unum that same day. Holden then timely appealed.

## II.  ANALYSIS

### A.    Standard of Review

In ERISA cases in which the insurance plan administrator is vested with discretion to interpret the plan, this Court reviews the denial of benefits under the arbitrary and capricious standard. *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 392 (6th Cir. 2009) (citing *DeLisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009)). It is undisputed here that Unum's long-term disability plan gives Unum the discretion to interpret its plan. R. 19, PageID #1469 ("The Plan, acting through the Plan Administrator, delegates to Unum and its affiliate Unum

Group discretionary authority to make benefit determinations under the Plan."); *see also* Appellant Br. at 12 (conceding that "[t]he policy at issue does include a grant of discretionary authority" and that the arbitrary and capricious standard applies).

That standard "is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (citing *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). We need only decide "whether the plan administrator's decision was 'rational in light of the plan's provisions.'" *Id.* (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). In other words, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis*, 887 F.2d at 693 (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). We must uphold the plan administrator's decision if that decision is "the result of a deliberate, principled reasoning process" and is "supported by substantial evidence." *Glenn v. Met. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd*, 554 U.S. 105 (2008)) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

With that said, we do not act as a rubber stamp on the plan administrator's decision, and the arbitrary and capricious standard is not "without some teeth." *McDonald v. W.-S. Life Ins. Co*, 347 F.3d 161, 172 (6th Cir. 2003) (quoting *Cozzie v. Met. Life Ins. Co.*, 140 F.3d 1104, 1108 (7th Cir. 1998)). We must "review the quality and quantity of the medical evidence and the opinions on both sides of the issue." *Id.* Nonetheless, in undertaking that review of the medical evidence and competing opinions, we must keep in mind that this "'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014).

**B.      Application**

Holden divides her arguments into two groups.  First, she claims that the quantity and quality of medical evidence renders Unum's decision arbitrary and capricious.  Specifically, she claims that Unum improperly relied on non-examining medical consultants; erroneously determined that because Williams & Connolly *caused* the disability, Holden was capable of working elsewhere; and that the evidence upon which Unum and the lower courts relied was legally and factually insufficient to outweigh Dr. Fischer's contrary opinion.  Second, Holden claims that Unum's decision is "tainted by procedural irregularities" and that Unum acted to advance its own conflict of interest.

i.      *Substantive Allegations*

As to Holden's first set of allegations, based on the administrative record "it is possible to offer a reasoned explanation, based on the evidence" for Unum's denial of Holden's long-term disability claim and, therefore, that denial was not arbitrary and capricious.  *Davis*, 887 F.2d at 693.  At bottom, the record is replete with evidence that Holden's disability arose from conditions inextricably intertwined with Williams & Connolly.  Further, Unum's plan defines long-term disability during the relevant period (the first 36 months of disability) as being limited from performing the material and substantial duties of the insured's "regular occupation," which Unum describes as the "occupation as it is normally performed in the national economy," rather than "how the work tasks are performed for a specific employer or at a specific location."  So, what mattered to Unum's determination—per the clear language of its plan—was not whether Holden was capable of performing her job at Williams & Connolly but rather whether Holden could have performed a similar job for *another* employer at *another* location.

From the beginning, Holden's complaints and allegations were specific to Williams & Connolly, and the extent to which her disability arose from Williams & Connolly-specific factors negates her claim for disability benefits under the language of Unum's plan. Holden reported "chronic stress there" given the low head count in accounting and resulting excessive hours and workload. Were the workload *alone* the only factor leading to Holden's leave, then Holden's claim for disability benefits might be stronger if, for example, there was evidence that similar jobs at other firms carried an equal workload. However, Holden's reported claims went beyond the workload. As she reported, much of her difficulty at Williams & Connolly stemmed from problems with specific colleagues including bullying, abuse, and harassment. Holden described her time at the firm as "traumatic" and said that she began withdrawing from others as a result of "these years of abuse at work**."** In Holden's conversation with Mears, Holden detailed the extensive problems she had at work—most of which appear to have stemmed from Holden's relationship with specific coworkers in the accounting department—and explained that "all of these little things coming together" led her to leave work.

Holden reported the same to her doctors, and those doctors consistently opined that Holden's challenges were workplace-specific. Indeed, nearly every report from Holden's treating physicians is centered around Holden's *work*; there is no indication that Holden's purported disability was caused by, exacerbated by, or related to anything other than Williams & Connolly. Consider first Holden's initial visit with Dr. Chang, who described Holden as presenting with stress-related anxiety and feeling "very stressed *from work*," having nightmares "because of altercations *at work*," and feeling victimized after being "passed up for a long expected promotion." Holden also met with Bradford who explained directly to Unum that Holden "presented with high anxiety due to traumatic interactions *in her workplace* which had been

ongoing for many months and had reached a peak in August 2015" when Holden left the firm. Holden's treatment by Dr. Bernard reveals the same. He explained that Holden "continues to struggle with PTSD *from her work*." Holden reported to Dr. Bernard that she had "constant problems at work" and felt like people at work were "in a clique and [had] something against her." Holden also reported to him that she had a history of "PTSD experienced at her work place" through "bullying . . . and mental stress from her coworkers[.]" Finally, Holden's evaluation by Dr. Ralph further reveals the extent to which Holden's struggles were workplace-specific. Dr. Ralph reported that Holden's time at the firm was "traumatic" and that Holden "has avoided situations that remind her of her former workplace" but had no other avoidant behaviors. Dr. Ralph explained that Holden's reported memory and cognitive issues could be "attributed to the chronic stress of working in a 'hostile work environment.'" The record thus reveals that each of these four individuals—all of whom met directly with Holden—reported Holden's conditions as being specific to Williams & Connolly.

Considering these opinions that Unum evaluated in the administrative record before it, Unum's decision was "rational in light of the plan's provisions" that required Holden be disabled from working at a similar job elsewhere. *Williams*, 227 F.3d at 712. It is "possible to offer a reasoned explanation" for Unum's denial of Holden's long-term disability benefits: the ubiquity of the evidence placing blame on Holden's former employer as not just *a* factor but *the* factor driving Holden out of work, and because it is *possible* to offer such an explanation for the denial, "that outcome is not arbitrary or capricious." *Davis*, 887 F.2d at 693. We do not ask whether the plan's decision was the most reasonable decision, or whether it was more reasonable to deny benefits than to grant them; instead, under the arbitrary and capricious standard—the "least

demanding form of judicial review"—we ask only whether it is *possible* to offer an explanation for the outcome. *Id.*

Holden's arguments to the contrary are unpersuasive when considering the record, our precedent, and the deferential standard of review under which we must consider this case. *First*, Holden argues that Unum improperly ignored evidence from Dr. Fischer in which he opined that she was disabled from working *anywhere*, not just at Williams & Connolly. It is true that, at times, Dr. Fischer submitted that Holden was incapable of working anywhere. At one point, he said that Holden would not be able to perform the same occupation for a different employer, though he provided no explanation in the space allowed to do so. There are two primary problems with using these statements from Dr. Fischer as evidence that Unum's decision was arbitrary and capricious. First, there are internal inconsistencies within Dr. Fischer's notes and opinions. For example, as Dr. Shipko noted in his file review, Dr. Fischer at one point reported that Holden was unable to think in a goal-directed manner, to organize and, to remember things, yet Dr. Fischer's chart notes also reflect "intact memory and logical realistic thinking." Dr. Ralph also explained that Holden "exhibited excellent motivation and persistence" on the evaluative tasks and that Holden's "[a]ttention and concentration" appeared within normal limits.[12] And as noted above, Dr. Fischer himself repeatedly stressed the extent to which Holden was suffering *due to work*. For example, Dr. Fischer told Unum that Holden's "condition [was] due to sickness involving [Holden's] employment" and was "stress related to work." Dr. Fischer detailed the extent to which Holden felt she had been "abused by the assistant director" and felt alienated from her peers. He initially described Holden as experiencing PTSD given an "[a]busive relationship at work." He explained that Holden "cannot function *at her current work situation*[.]" Dr. Fischer's contemporaneous

---

[12] In this regard, Dr. Ralph's neuropsychological evaluation conflicts with Dr. Fischer's statement to Unum that Holden had "poor concentration" and an "inability to focus."

evaluation of Holden was thus inconsistent with his later-filed conclusion that Holden was incapable of working anywhere. When we are tasked with asking only whether it is possible to offer a reasoned explanation for Unum's decision, *Davis*, 887 F.2d at 693, then we cannot require Unum to adopt *some* of Dr. Fischer's observations while discrediting others.

The second, and more important, problem with Holden's argument here is that even if Dr. Fischer had consistently and unequivocally stated that Holden was incapable of working anywhere, Unum is not *required* to defer to Dr. Fischer's opinion. In *Black & Decker*, the Supreme Court made clear that in ERISA cases, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). In so holding, the Supreme Court rejected the application of the "treating physician" rule (from Social Security cases) to ERISA cases because "[n]othing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians." *Id.* at 831. When a plan administrator like Unum "chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169. Unum therefore did not act arbitrarily and capriciously in crediting other treating physicians—all of whom tied Holden's condition to her workplace—in finding there was insufficient evidence that Holden was incapable of working at another firm.

True, this Court has held that plan administrators cannot outright *ignore* a treating physician's competing conclusion or refuse to even explain the reason for its rejection of the

treating physician's conclusion, but neither of those shortcomings is present here. We have noted that the "[t]he failure of . . . independent-review physicians . . . to explain why they [have] disregarded the opinions of [treating doctors wa]s arbitrary." *Cooper v. Life Ins. Co. of. N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007) (citing *McDonald*, 347 F.3d at 170-73). For example, in *Glenn*, we held that a plan administrator's decision to deny benefits was arbitrary and capricious when those reviewing the claimant's file made no mention whatsoever of a treating physician's letter in which that treating physician unequivocally said that his patient was not able to work. *Glenn v. MetLife*, 461 F.3d 660, 670-71 (6th Cir. 2006). We found this arbitrary and capricious for two reasons. First, there was no indication that the defendant-administrator even provided the reviewing doctor with the treating physician's letter unequivocally saying the claimant could not work, so we questioned the thoroughness of that physician's review if that review had not been based upon all of the medical records. *Id.* at 671. Second, there was "no explanation in the notice for the failure" to give the treating physician's report any weight in the decision to deny benefits. *Id.* at 670. It was thus arbitrary and capricious to ignore—or fail to provide any reason for rejecting—the report from the only doctor to have personally treated (or even seen) the claimant. *Id.* at 671.[13]

Similarly, in *Hayden* we found arbitrary and capricious the administrator's reliance on a reviewing physician's report when that reviewing physician applied a "heightened standard" for disability that was inconsistent with the language of the plan, the reviewing physician's conclusion

---

[13] These facts *alone* did not render the administrator's decision arbitrary and capricious. In *Glenn*, we also found the denial arbitrary and capricious because the administrator failed to consider the fact that the claimant was awarded disability benefits from the Social Security Administration. *Glenn*, 461 F.3d at 667. We found it suspect that the defendant assisted the claimant in obtaining SSA benefits—and thus reaping the financial benefit of that when the SSA awarded them—but then outright ignoring the SSA's contrary decision in its denial of disability benefits. We found those two factors relevant in determining that the defendant's decision was arbitrary and capricious. *Id.* These factors are not relevant in this case where Holden never applied for Social Security disability benefits.

contradicted the unambiguous conclusions of several treating physicians, and the reviewing physician implied that the plaintiff's condition was caused by the specific workplace, yet the record revealed the plaintiff's mental illness was caused by *non*-work-related issues. *Hayden v. Martin Marietta Materials, Inc. Flexible Ben. Program*, 763 F.3d 598, 608-09 (6th Cir. 2014) ("The plan administrator must give reasons for rejecting a treating physician's conclusions, and those reasons must be consistent with the terms of the plan and supported by the record.") (internal quotation marks and citations omitted); *see also Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) ("Instead of offering evidence to contradict [the treating doctor's] residual-functional-capacity questionnaire's conclusion, the Plan's physician advisors simply ignored the questionnaire and concluded that Shaw could perform sedentary work."); *Gillespie v. Liberty Life Assur. Co.*, 567 F. App'x 350, 353 (6th Cir. 2014) ("There is nothing in the record that suggests Liberty or its [reviewing] doctors gave any weight to the evidence from Gillespie's [treating] doctors that tended to show that Gillespie could not work in a full-time capacity[.]").

Such is not the case here, where the reviewing physicians engaged with—and explained their disagreement with—Dr. Fischer's at-times contradictory reports. There is no evidence, nor is there any allegation, that the plan administrator did not provide the reviewing physicians with all of Holden's files (as in *Glenn*) or outright ignored Dr. Fischer's reports (as in *Hayden*, *Shaw*, and *Gillespie*). For example, Dr. Kletti noted that one of Fischer's conclusions was contradicted by other evidence in the record. Dr. Fischer's statement that Holden was not thinking in a goal-directed manner was contradicted by Holden's statement to Unum that she spent her time researching a lawsuit against Williams & Connolly. Dr. Shipko noted a separate contradiction in Dr. Fischer's statement when, as noted above, Dr. Fischer reported to Unum that Holden could not think in a goal-directed manner and had poor memory, when his chart notes from Holden's visit

reflected "intact memory and logical, realistic thinking." Dr. Shipko also found suspect the conclusion that Holden was incapable of concentrating or organizing when she was preparing a separate lawsuit against her former employer. Dr. Kletti and Dr. Shipko did not base their conclusions solely on their disagreement with Dr. Fischer; rather, each credited certain statements from Dr. Fischer (in which he tied Holden's conditions to her workplace, such as noting that Holden's condition was "stress related to work") as well as Dr. Chang's diagnosis of *situational* depression and description of Holden as "feeling anxious because of altercations at work."[14] In *Gillespie*, we explained that the reviewing physicians' reports "would have been less problematic" if they "had addressed the contrary medical evidence and explained why they were disregarding it." *Gillespie*, 567 F. App'x at 354. Such is the case here, where the reviewing physicians both addressed the contrary medical evidence and explained that they were disregarding it because some of Dr. Fischer's statements—those that Holden says Unum should have credited—were (1) internally inconsistent in certain respects, (2) inconsistent with Holden's own statements and actions, and (3) inconsistent with other credible medical evidence.

Holden's second counterargument is that Unum relied too heavily on non-treating physicians to reach its decision to deny benefits. In essence, Holden takes issue with the fact that Unum conducted a "file review" rather than examining Holden themselves, as the policy gives Unum the discretion to do. There is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). We have, however, noted that "the failure to conduct a physical

---

[14] Nor did either reviewing physician ignore Dr. Fischer's records or fail to confer with him. This is unlike *Glenn* where we questioned whether the reviewing physician even had access to certain reports of the treating physician who had diagnosing the patient as totally disabled. *Glenn*, 461 F.3d at 670-71. The administrative record here notes that (1) each reviewing physician considered Dr. Fischer's opinions and (2) one reviewing physician, Dr. Kletti, spoke with Dr. Fischer.

examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* at 295. The failure to conduct an examination, we have cautioned, is especially problematic when the plan administrator makes the determination to deny benefits based on an assessment of the credibility of the claimant. *Helfman*, 573 F.3d at 395-96 ("[W]here an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary.").

The first problem with this argument is that Unum did not deny benefits based on any credibility determination regarding Holden. In *Shaw*, we took issue with the file-only review when the administrator "made a credibility determination about Shaw's continuous reports of pain" without examining Shaw themselves. *Shaw*, 795 F.3d at 550. Similarly, in *Bennett*, we found problematic the reviewing physician "impl[ying] in his file review that Bennett is not credible, despite the fact that he had never physically examined her." *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008). This was especially troublesome there because the reviewing physician "based this [credibility] determination on notes from Bennett's treating physicians, but none of those physicians ever cited any concerns that Bennett was malingering[,]" and, in fact, concluded the *opposite*. *Id; see also id* at 556 ("We are also troubled by [the reviewing physician's] reliance on file reviews that imply Bennett is not credible, when in fact, no one who actually examined Bennett reached that conclusion."). The same concerns are not present here; Unum, in many respects, appears to have based its decision by *crediting* Holden's own statements rather than finding her not credible. *See, e.g.*, R. 19, PageID #1628 ("[Holden] states all of these little things [came] together [and] led to her going out of work."). Over and over, Holden reported

(to her treating doctors and to Unum) about workplace-specific problems at Williams & Connolly, and we cannot fault Unum's reliance on those very statements.

The second problem with Holden's file-review argument is that Unum evaluated a comprehensive medical record, and, given this review, Unum was reasonable in using its discretion—discretion provided by the clear language of the plan—in not conducting a separate examination of Holden; as the Magistrate Judge below noted, any such review "would have been superfluous." Burgos looked at both Dr. Chang's evaluation of Holden (and her opinion that Holden's complaints were workplace-specific) and several months of notes from Dr. Fischer. Dr. Kletti considered Dr. Chang's evaluation ("nightmares and feeling anxious because of altercations at work") as well as Dr. Fischer's attending physician statement in which he notes that Holden's condition was "[s]tress related to work" and that Holden "feels that she was in an abusive relationship at work." Both Dr. Black and Dr. Brown looked at Dr. Ralph's comprehensive neuropsychological exam in which Dr. Ralph explained that Holden's difficulties "were attributed to the chronic stress of working in a 'hostile work environment'" and in which Dr. Ralph reported that Holden had "no specific fears or avoidance behavior, with the exception of avoiding her workplace." Dr. Brown also considered Dr. Chang's evaluation, Dr. Fischer's notes, Holden's therapy notes from Bradford, Dr. Bernard's neurology notes, and Holden's file from her time at the hospital. As we found in *Judge*, Unum's reviewing experts' conclusions in many, if not most, respects simply "echo those of [Holden's] own doctors, make note where the reports lack objective medical evidence in support of the boxes checked, and point out the internal inconsistencies" in the medical files reviewed. *Judge v. Met. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013).

To the extent Holden argues that the failure to conduct Unum's own examination was especially problematic because a psychiatric condition was at issue, the cases Holden relies upon

are inapposite. For example, in *Campbell v. United States*, 307 F.2d 597 (D.C. Cir. 1962)—a criminal case—the D.C. Circuit found a psychiatrist's testimony was of "little probative value" when the "psychiatrist had no information about defendant's mental condition, testified largely in terms of a legal conclusion, and had never seen defendant prior to trial." *Id.* at 598. It cannot be said that the reviewing physicians here had "no information" about Holden's mental condition, nor that they provided solely legal conclusions. As explained above, Unum's reviewing physicians had a robust record of treatment—by a primary-care physician, a psychiatrist, a neurologist, a behavioral-health therapist, and a social worker.[15]

This Court has never held that if a psychiatric determination is at issue, it is necessarily arbitrary and capricious to fail to conduct an independent medical evaluation. *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495 (6th Cir. 2008) is the most on-point authority for the idea that the standard may be different when considering psychiatric conditions. In *Smith*, a case in which a psychiatric condition was at issue, this Court faulted the plan administrator for

---

[15] Holden's other cases are distinguishable. For example, in *Westphal*—which Holden cites as "finding arbitrary and capricious reliance on non-examining psychiatrist to find claimant not disabled"— the district court found there was "insufficient reliable evidence" to support a finding that the plaintiff was not disabled when two treating physicians, one independent psychiatric evaluator, and the SSA all unambiguously determined that the plaintiff was disabled. *Westphal v. Eastman Kodak Co.*, No. 06-CV-6120, 2006 WL 1720380, at *1, *4 (W.D.N.Y. June 21, 2006). True, the district court there noted that a file review was "inherently less reliable than an opinion based on a face-to-face examination," but then continued that this was problematic "*particularly* in a case as this, where the opinion of *every* physician who actually examined the plaintiff agreed that the plaintiff is disabled." *Id.* at *4 (emphases added). The difference, then, is that here, it is not the case that every treating doctor unequivocally said Holden was disabled. Unum, in fact, relied on the diagnoses and evaluations of some treating physicians while discrediting some of Dr. Fischer's statements; Unum did not rely entirely on the evaluations of *non*-treating physicians while discrediting *every* treating physician.

Holden and many of the cases upon which she relies point to *Sheehan v. Met. Life Ins. Co.*, 368 F. Supp. 2d 228 (S.D.N.Y. 2005) for the general proposition that a non-treating psychiatrist's determinations cannot alone form the basis for the denial of disability benefits. In that case, "the procedure MetLife employed in determining [the claimant's] psychiatric condition was limited to obtaining an opinion from a psychiatrist who never examined [the claimant]." *Id.* at *255. Unum's review, however, was not limited to the opinion of solely non-treating physicians. Rather, Unum considered both (1) treating physicians and therapists and (2) the opinions of non-treating physicians and consultants.

failing to conduct its own examination because the defendant "breached its fiduciary duty to make certain that reliance on its experts' advice was reasonably justified under the circumstances." *Id.* at 508. It is important to note that the failure to conduct the defendant's own examination was not the only fact on which the Court relied in deeming the decision arbitrary and capricious.[16] For example, the reviewing physicians credited the plaintiff's passing a real-estate exam as evidence of his lack of disability, when the plaintiff actually passed that exam *before* the alleged onset of his disability. *Id.* at 507. Another reviewing expert opined that the plaintiff suffered no functional impairments, relying on the plaintiff's statement that he felt "pretty much OK" but failing to mention whatsoever the plaintiff's diagnoses of ADHD and bipolar disorder and the fact that the plaintiff made this vague statement immediately after being hospitalized for his psychiatric conditions (such that his statement was not very credible or worthy of justifying a lack of disability). *Id.* at 506. Further, that same reviewing expert "significantly understate[d] the clinical findings of a physician who personally examined the claimant" when the reviewing expert stated that the plaintiff had merely "impairments" in certain skills, when the treating physician said not that those skills were *impaired* but rather that they were "limited to poor" and that the plaintiff would be "'usually precluded' from functioning in those areas. *Id.* at 506-07. The district court described this particular expert's report as "misleading at best and an outright distortion at worst." *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F. Supp. 2d 856, 872 (E.D. Tenn. 2016). This Court thus found that the "obvious shortfall in the analytical framework" used by the reviewing experts (i.e., the failure to conduct their own examination) "*in conjunction with* the

---

[16] We also made clear we were not establishing a rule that the plan administrator must defer to the treating physician when a psychiatric condition was at issue but were instead making a case-specific determination that the failure *in that case* contributed to the holding that the denial was arbitrary and capricious. *Smith*, 275 F. App'x at 508 (noting that our decision was "[b]ased on the facts of this case, rather than on a blanket rule of according outcome-determinative weight to treating or examining physicians").

numerous factual errors, misunderstandings, and analytical omissions" of the reviewing physicians, together led the Court to conclude there was "no reliable evidence to support the conclusion that the plaintiff was competent to return to his previous occupation." *Smith*, 275 F. App'x at 509 (emphasis added).[17]

In contrast, here Unum did not refuse to credit objective evidence supporting Holden's disability. In fact, Unum's reviewing experts relied on objective evidence in finding that Holden was not disabled from performing her regular occupation for another employer. Unum, unlike the defendant in *Smith*, was "reasonably justified" in relying on its reviewing experts' and physicians' conclusions because those conclusions were supported by objective medical evidence, by Holden's own statements to her doctors and Unum, and by the majority of Holden's treating physicians (including, at certain times, Dr. Fischer). Nor does Holden point us to any "factual errors, misunderstandings, [or] analytical omissions" such as those found by the *Smith* Court. Rather, Holden claims that Unum *should have* credited some of Dr. Fischer's conclusions while ignoring some of his other statements, other doctors' conclusions, and Holden's own words. This Court's job, however, is not to decide which conclusion was more credible or reasonable; instead, this Court decides only whether it is "possible to offer a reasoned explanation, based on the evidence" for Unum's decision. *Davis*, 887 F.2d at 693.

Finally, we reiterate that even if Unum should have conducted its own examination of Holden, that act alone would not itself render Unum's decision arbitrary and capricious. After all, we consider "not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed*

---

[17] One of the reviewing physicians in *Smith* failed to even consider any medical records, instead relying solely on a conversation with and statement from one of the plaintiff's treating doctors. *Smith*, 444 F. Supp. 2d at 871.

*Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002); *see also Carty v. Met. Life Ins. Co.*, 224 F. Supp. 3d 606, 618 (M.D. Tenn. 2016) ("Even if in-person examination is favored . . . 'reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly.'" (quoting *Calvert*, 409 F.3d at 295) (alteration in original)). Compare Unum's actions here with the actions of the defendant in *Shaw*. There, the defendant not only failed to conduct its own examination, *Shaw*, 795 F.3d at 550, but also wholesale ignored a treating physician's objective conclusions regarding the plaintiff's ability to perform sedentary work (importantly, with no explanation for its disregard of that report). *Id.* at 548-59. In contrast, the reviewing experts here explicitly acknowledged and explained their disagreement with Dr. Fischer's conclusion to the contrary. In *Shaw*, the defendant not only ignored favorable evidence, but also failed to even make a reasonable effort to speak with the plaintiff's treating physicians. *Id.* at 549. In contrast, some of the reviewing experts here spoke directly with those who treated Holden. In *Shaw*, the reviewing physicians made objectively inaccurate and contradictory statements, such as explaining there were "no recent objective range of motion measurements" and then contradicting that in the *very next sentence* by noting specific range-of-motion measurements. *Id.* at 549. Holden points us to no internally contradictory or inaccurate statements of fact within the experts' conclusions but rather disagrees with those conclusions. All of this is to say, even if we were to find that Unum's file reviewers should have examined Holden themselves, that alone would not render Unum's ultimate decision arbitrary and capricious. Instead, we consider the record as a whole and ask whether Unum's decision was the result of a "deliberate, principled" reasoning process and whether it is possible to offer a reasoned explanation for its decision. *Davis*, 887 F.2d at 693.[18]

---

[18] Consider also the totality of the facts in *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501 (6th Cir. 2005) in which we found the defendant's decision arbitrary and capricious. There,

ii.     *Procedural Allegations*

Holden makes three further allegations that the district court characterized as procedural. *First*, she claims "Unum materially changed its reason for denying the claim between its initial and final decisions." The first denial, she asserts, was based on her purported ability to perform her job elsewhere such that she was not disabled, and the subsequent denial was based not on her disability but rather on the timing of her disability. Holden thus claims she was unable to proffer evidence to counter Unum's conclusion that her illness requiring hospitalization in 2016 was distinct from that which took her out of work in 2015. Unum did not, however, change its reason for denying Holden's claim. The first denial in January of 2016 was based on Unum's conclusion that Holden was "able to perform the duties of [her] regular occupation as it is normally performed in the national economy." The subsequent affirmance of that first denial concedes that Holden may have been disabled as of July 2016 (right before she was hospitalized) but that during her coverage period, Holden was not disabled *for the same reasons as the first denial*, i.e., that the medical evidence revealed workplace-specific conditions. Unum's invocation of the hospitalization and the fact that Holden may have been disabled *at that time* (i.e., after her coverage ended) was unnecessary to its denial of her benefits during the coverage period, and Holden herself concedes that as of her hospitalization, she was no longer covered. Unum's decision, therefore, did not materially change. For both denials, the key determination was the finding that Holden, during her coverage period, was not disabled from working for another employer and, as such, under the language of the plan, did not qualify for benefits.

---

the administrator based its decision on the opinion of a doctor who found that the plaintiff might be capable of *sedentary* work while ignoring that his occupation was not sedentary (in a scenario similar to that here, where the issue was whether the plaintiff could return to that same occupation). *Id.* at 507. The reviewing physician's report also failed to rebut contrary conclusions that the treating physician reached, failed to consider whether the plaintiff's depression would affect his return to work, and failed to even mention the findings of the defendant's own field investigator that undermined the defendant's position. *Id.* at 510.

*Second*, Holden claims that Unum withheld evidence that would have shown her 2016 hospitalization was related to her earlier conditions while at Williams & Connolly, thereby revealing that her 2016 hospitalization was a result of the same disorder (from 2015) and thus proving her condition was not work-specific because it continued well after she ended work. The purportedly withheld evidence comes from Holden's short-term disability file, when a representative from Unum spoke with someone at Williams & Connolly who described Holden as having a "lot of family issues that built up[,]" explained that "there were a lot of work issues that were not work-related issues[,]" and opined that Holden was "displaying paranoia." This, Holden claims, is proof that her paranoia—as diagnosed in the summer of 2016 at the GWU Hospital— was nothing new. There are two issues with this argument. First, the record is replete with evidence that Holden's paranoia and mania that merited hospitalization in 2016 were new conditions caused by later events. Holden presented to the hospital with "delusions of being monitored and followed by her former employer" and the "onset of paranoia" as a result of Holden believing that Williams & Connolly was tracking her. Holden reported to doctors on August 3, 2016 that "*as of 1 week ago*, she started having paranoid ideation involving her former employer, who she believes has bugged her house." Additionally, medical records from the time she was covered do not show any indication of paranoia or mania. Dr. Fischer noted on October 26, 2015 the *lack* of mania, panic disorders, phobias, or obsessions. He wrote that Holden had "logical" and "realistic thinking" with "[n]o abnormalities noted" and "no delusional thinking." These observations, taken shortly after Unum's phone call with Williams & Connolly on October 8 (the source of the purportedly withheld information), therefore directly contradict Holden's assertion that her paranoia and mania that resulted in hospitalization were extensions of the same condition that led to her leaving work.

The second problem with the withholding-information argument is that the phone call with the representative at Williams & Connolly was ambiguous and the opinion of a lay person. The person reported that she "thinks [Holden] was displaying paranoia" and gave the example of Holden accusing Williams & Connolly of taking her vacation days while Holden waited on Unum to approve her for short-term disability. There is no indication that the person at Williams & Connolly intended for this to be any sort of medical diagnosis of paranoia; rather, as the district court noted, the term "paranoia" is often "used and defined differently in colloquial versus clinical settings." When *none* of Holden's treating physicians, therapists, or evaluators diagnosed her with paranoia or mania until Holden's post-coverage period, Unum's decision not to consider this phone call with a lay person does not render its ultimate decision arbitrary and capricious.

This situation—not including notes from a phone call with someone at Holden's former employer—is different than a plan administrator's failure to consider, for example, both the SSA's determination that the claimant was disabled as well as a treating physician's unequivocal conclusion that the claimant was totally disabled. *See Glenn*, 461 F.3d at 670. This is different than a plan administrator's file reviewer noting that a functional capacity evaluation "might be of some value" when, in fact, a functional capacity evaluation had already been completed. *Calvert*, 409 F.3d at 296.[19] This is different than a plan administrator sending its reviewing physician only one "aberrant" evaluation and failing to send the rest of the claimant's file that included a separate evaluation reaching the directly opposite conclusion. *Spangler*, 313 F.3d at 362 ("Why Met Life did not also send [the treating physician's] report or the rest of Spangler's file . . . for review by

---

[19] In *Calvert*, the reviewing physician also asserted that there was "no objective data" to support any restriction on the claimant's activity; this conclusion failed to mention the x-rays and CT scans that showed such restrictions, the SSA's conclusion that the claimant was disabled, and several treating physicians' conclusions that the claimant was restricted. *Calvert*, 409 F.3d at 296-97.

the vocational consultant is inexplicable. Indeed, we can only conclude that Met Life, as Spangler contends, 'cherry-picked' her file in hopes of obtaining a favorable report from the vocational consultant as to Spangler's inability to work."). Finally, this is different than the failure to consider contrary medical conclusions reached by the claimant's treating physician as well as observations by the plan administrator's own field investigator (observations that supported a finding of disability). *Kalish*, 419 F.3d at 510-11.

*Third* and finally, Holden claims that "Unum's decisions . . . as a whole create an illogical timeline, while advancing Unum's financial conflict of interest." Essentially, Holden argues that because Unum approved her *short-term* disability claim, it should have approved her long-term disability claim, at least if there was "no change in the underlying evidence" between consideration of the short- and long-term claims. Holden's argument here is not persuasive; she presents no authority for the proposition that if an insurer approves a short-term disability claim, it is necessarily improper for it to thereafter deny a long-term disability claim.[20] Importantly, Unum did not have access to all of the medical records described above. Holden applied for short-term disability benefits on August 12, 2015, and Unum granted those benefits a couple of weeks later (on August 29, 2015). After August 29, 2015, Unum received numerous chart notes from Dr. Fischer from August through November and, importantly, had three experts review Holden's files. Unum considered Holden's short-term disability claim for only two weeks, and considered her

---

[20] *See Cassidy v. Aetna Life Ins. Co.*, No. 6:19-cv-000201-GFVT, 2021 WL 1857297, at *4 (E.D. Ky. May 10, 2021) (finding that claimant "cites to no case law in support of [the] argument" that it is arbitrary and capricious to fail to explain the decision to deny long-term disability benefits after the claimant received short-term benefits); *see also Carroll v. Hartford Life & Acc. Ins. Co.*, 937 F. Supp. 2d 247, 274-76 (D. Conn. 2013) ("Carroll provides no evidence that the body of facts actually reviewed for purposes of short term and later long term disability benefits was the same . . . Receipt of short term disability benefits under the terms of the Policy constitutes neither requirement nor a qualifier for entitlement to long term disability benefits."); *Johnson v. Met. Life Ins. Co.*, No. 3:06-cv-417-RJC, 2009 WL 2973045, at *5 (W.D.N.C. Sept. 15, 2009) ("MetLife made its decision based on the information it had at that time, and its decision changed as it gathered more information.").

long-term disability claim for several months.  Unum is not required to come to the same conclusion.  A rule to the contrary would, in effect, require any plan administrator to grant long-term disability benefits if it had previously granted short-term benefits.  This would vitiate the distinction between the two, and, perhaps, make plan administrators less likely to grant short-term benefits (or, at minimum, make that process take more time).[21]

## V. CONCLUSION

This case boils down to the medical evidence showing that Holden left Williams & Connolly for reasons *specific to* Williams & Connolly.  We are mindful of the "extremely deferential review" we must conduct when considering the denial of benefits under the arbitrary and capricious standard.  *McClain*, 740 F.3d at 1064.  Under this standard—the "least demanding form of judicial review"—we ask not whether Unum's decision was the most reasonable decision, or even whether it was more reasonable to deny benefits than to grant them; instead, we ask only whether it is *possible* to offer an explanation for Unum's decision to deny benefits,  *Davis*, 887 F.2d at 693, and whether the decision was "rational in light of the plan's provisions." *Williams*, 227 F.3d at 712.  Because it is possible to offer such an explanation here—Holden's condition was specific to her former firm—and because the voluminous medical evidence supports that conclusion, we affirm.

---

[21] To the extent Holden is arguing more generally that Unum was acting under a conflict of interest in denying her benefits, given that some of the reviewers were employed by Unum, "Sixth Circuit caselaw requires a plaintiff not only show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue."  *Cooper*, 486 F.3d at 165 (quoting *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)).  We have found such "significant evidence" where, for example, the plan administrator's internal emails noted that the administrator's employees were "working on denying this claim"  *Evans*, 434 F.3d at 880, or where the plaintiff put forth evidence that the consulting physician's (i.e., the reviewing physician's) "conclusions have been questioned in at least three federal cases," with those prior courts noting, for example, that the reviewing physician's language "appears deliberately ambiguous and vague."  *Elliott v. Met. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006) (citations omitted).  Here, Holden, like the plaintiff in *Cooper*, merely asserts—without evidence, much less "significant evidence"—that any purported conflict of interest actually motivated Unum's decision to deny her long-term disability benefits.

COOK, Circuit Judge, concurring in the judgment. The majority acknowledges our arbitrary and capricious standard of review as "the least demanding form of judicial review." Maj. Op. at 20 (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). Yet "we seem to stray improperly from that standard in favor of a more searching one." *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 556 (6th Cir. 2008) (Cook, J., concurring in the judgment). To me, the majority's lengthy opinion appears closer to de novo review of Unum's decision.

This court's "extremely deferential review" simplifies our task. *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014). We uphold a plan administrator's decision that resulted from "a deliberate, principled reasoning process . . . supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). Unum's review plainly fits the bill. In denying Holden long-term disability benefits, it reviewed the opinions of several physicians, psychiatrists, and therapists; all save one supported Unum's conclusion that Holden could return to work for a different employer.

Holden's quibbles with Unum's review fall short of presenting a successful challenge. First, Holden complains that Unum erred in not crediting Dr. Fischer's opinion over that of others. We've rejected that argument before. *See McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) ("[W]hen a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious.") And it matters not, as Holden contends, that Unum accepted findings from non-examining doctors over Dr. Fischer, a treating physician. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825

(2003) ("[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians.")

Holden also maintains that "procedural errors" tainted Unum's decision. Those errors she targets draw no support from the record. And what is more, Holden fails to explain how such errors could render Unum's otherwise thorough review "arbitrary and capricious."

Having rejected both Holden's arguments, we need say no more. I concur in the court's judgment.